[Crim. No. 21109. Dec. 31, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
PATRICK CROY, Defendant and Appellant.

4

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Supreme Court, Gail R. Weinheimer and Allan H. Keown, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Arnold O. Overoye, Assistant Attorney General, Edmund D. McMurray, Robert D. Marshall, Michael T. Garcia and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GRODIN, J.**—Appellant stands convicted of first degree murder (Pen. Code, §§ 187, 189),[1] conspiracy to commit murder (§ 182), attempted murder (§ 664), robbery (§ 211), and assault with a deadly weapon on a peace

---

[1] All references to code sections are to the Penal Code.

officer (§ 245, subd. (b)). In addition, the jury found two special circumstances—committing murder in the course of a robbery and murdering a police officer in the line of duty (former § 190.2, subd. (c)(1) & (c)(3)(i))—and imposed upon appellant the sentence of death pursuant to the 1977 death penalty statute. This appeal is automatic.

Most of appellant's arguments we find to be without merit. Analysis of the jury instructions in light of recent case law reveals, however, two fundamental errors. First, in connection with the robbery count, the jury was instructed in terms which permitted them to convict appellant of that crime on the prosecution's aiding and abetting theory without necessarily determining appellant acted with requisite intent. In *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], we held that such instructions are erroneous. Here, as we shall explain, the error requires reversal of the murder conviction as well as the robbery conviction, since the jury was permitted to find appellant guilty of first degree murder on the basis of a felony-murder theory, using the robbery charge as its predicate. Similarly, the erroneous instruction requires reversal of the attempted murder convictions inasmuch as the same felony-murder instruction was given as a predicate for conviction on those counts, thereby eliminating the necessity that the jury find the element of malice.

Accordingly, while we affirm appellant's convictions of conspiracy to commit murder and assault with a deadly weapon, we must reverse the judgments of conviction of murder, attempted murder, and robbery, subject of course to the People's right to retry defendant on those counts.

*Facts*

Appellant Patrick Croy, a 23-year-old employee of a logging camp, left work on Friday, July 14, 1978, intent upon a weekend of "partying"—drinking, smoking marijuana and hashish, dancing, and relaxing with friends. This he soon proceeded to do. By Sunday evening, July 16, 1978, appellant had consumed large quantities of whiskey, beer, and drugs.

Approximately 5:30 Sunday night, the party had moved to the apartment of Willie Griffith, on the second floor of an apartment complex in Yreka. Roughly 20 people were in attendance at the party by this point, including appellant and 4 individuals who would become codefendants—Norma Jean Croy, Carol Thom, Jasper Alford, and Darrell Jones.[2] Appellant was drinking whiskey and seemed to "be in good spirits."

---

[2]The severance motions of Carol Thom and Jasper Alford were granted. They were tried separately in a later proceeding.

A witness who lived in a neighboring apartment testified the party was audible from her unit, and that at approximately 10:30 she heard the sound of several people rapidly making their way from the second floor to the first, apparently leaving the gathering. The sound of breaking glass soon followed.

Shortly thereafter a police car arrived in the parking lot, responding to a call from a neighbor directed at quelling the "disturbance" allegedly caused by appellant and his companions. The witness glanced out her window and noticed the officers leave the lot, only to return about 20 minutes later. At that point appellant engaged one of the officers in a heated conversation. Appellant attempted to strike the officer, but was restrained by two of his friends. The witness testified she saw the officers leave, and appellant return to the apartment building. He was talking to himself, and was overheard muttering, "I'm going to get a gun."

After a discussion among several of the people at the party, during which a witness who lived in the building testified she heard it suggested a gun and bullets be obtained so that the unidentified speakers could "tear Yreka up tonight," a group including Willie Griffith, Jasper Alford, Carol Thom, Darrell Jones, Barbara Thom, Patty Yoachem, and appellant prepared to leave the apartment. On their way to a car, another unidentified male voice proclaimed either, "I'm going to shoot him," or "I'm going to shoot the sheriff," though once in the car the group discussed where to go next to "party," and someone suggested they hunt deer in the woods nearby. The group stopped to pick up Norma Jean Croy and Annette Yoachem, who were drinking in a field, then drove to the apartment of appellant's girl-friend, Barbara Conrad, with whom he had been living and where he kept some of his belongings, including his rifle.

Conrad was pregnant, so had chosen not to join in the drinking and smoking that night. She testified appellant entered her apartment and asked her for bullets for his rifle. Because appellant appeared to Conrad to be quite intoxicated, she only pretended to look for the bullets, rather than actually turn some over to him. As a result, appellant left without the bullets. When he emerged from the apartment he was carrying a rifle, however. He returned to the car, where Willie Griffith recalled hearing Carol Thom state she "wanted to get some cops." Griffith drove the group to the nearby town of Montague where Thom's car had been left. During the ride another person suggested buying some beer, reiterating the idea to shoot deer, and someone said they would have to get more shells as they had none.

Griffith left appellant, Jasper Alford, Darrell Jones, Norma Jean Croy, Carol Thom, and another friend, Tad Super, in Montague where they picked

up Thom's car and drove to the Sports and Spirits Liquor Store in downtown Yreka.

Appellant had been to the liquor store earlier that evening. During this previous visit, he had purchased two 6-packs of beer with a check. An argument had ensued with the clerk, John Thurman, over the amount charged, and the change to which appellant was entitled. The dispute was not resolved, because appellant's money had become mingled with the change tendered by Thurman, and there was thus no way to tell precisely how much change appellant received. Thurman believed that appellant had been given $2 in excess change.

Given his perception of what had transpired during this earlier incident, Thurman was angered by seeing appellant, who appeared to be intoxicated, enter his store again that evening. Thurman demanded the return of the additional change from appellant, declaring he did not "appreciate being ripped off." Appellant seemed apologetic but told Thurman he did not have $2. By this point Tad Super joined appellant, and suggested the difficulty was due to Thurman's failure to dispense the proper change, not any lack of honesty on appellant's part.

Now Norma Jean Croy and Carol Thom entered the store. Thom demanded of Thurman, "What's your beef?" She then proceeded to become loud and abusive. Thurman "did not want to hear it any more," and directed Thom to leave if she wished to persist. He then returned to the task of setting up a cigarette display case. The members of the group began to talk among themselves. Thom then approached the counter and knocked over the cigarette display. Thurman grabbed the tray as it was falling, only to have Thom further disrupt the items on the counter.

Thurman, seeking, in his words, "to get the upper hand," ordered the group to leave his store. He went to the telephone with the intention of calling the police, for he feared Thom would escalate the scuffle and felt unable to contain her from "tearing up the store." Thurman began dialing when he felt a sharp pain in his back. Norma Jean Croy had placed a sharp object, possibly a can opener, against Thurman's shirt, and stated, "Don't give me any trouble, but we're going to the cooler." She forced him toward the back of the store where the walk-in cooler was located. As she did so, Thom began grabbing Thurman's hair and face, and exclaimed "stab him, stab him." In the struggle his glasses were lost making it difficult for him to identify persons. Concerned for his safety, Thurman raced from the store. He yelled to the attendant of a neighboring gasoline station that he had been stabbed—though in truth, he had not—and told the attendant to call the police. As Thurman ran he noticed a person, apparently appellant, but

whom he could not identify, standing near the car in which he had seen appellant and his companions arrive. The car was now parked parallel to the store in a position from which it could be driven forward to the highway. The car had been parked facing toward the store earlier. Thurman implored appellant, "Stop them. I think they're trying to rob me," to which appellant, who had begun walking back to the store, replied, "No, they are not." A police officer drove up almost immediately. Appellant returned to the driver's side of the car, where he was met by Thom and Norma Jean Croy. Appellant drove away with Norma Jean Croy, Carol Thom, Darrell Jones, and Jasper Alford. Tad Super had left the group. Thurman pointed his finger in the direction of the vehicle and yelled to the officer on the scene, "Get them!"

When Thurman returned to the store after the group had driven off he found the cash register apparently untouched, though some items in the store had been knocked to the ground, and there was a $20 discrepancy between the money in the till and the total on the tape. Among the items knocked over was a small ammunition case. Although no recent inventory had been taken of the ammunition, the case had been restocked two days earlier with ammunition of the same caliber as that used in appellant's rifle. A comparison of an earlier inventory, sales records, and the ammunition found in the box later indicated that while none had been sold since the box was restocked, as many as four boxes of ammunition, Winchester Super X .22 magnum shells, were missing.

The officer who had begun pursuit of the car being driven by appellant was soon joined in the chase by other police vehicles. One of these automobiles was fired upon from the fleeing car. The officers pursued appellant's car to an area in the mountains near a cabin owned by appellant's grandmother. Appellant, Norma Jean, and Darrell ran up the hillside behind the cabin. The officers shined spotlights on the hillside. Carol Thom and Jasper Alford remained near their car at the base of the hill where the arriving officers attempted to take them into custody. Officers Cloyd and Quigley moved from the shelter of the line of police cars into an open area in an attempt to apprehend Jasper Alford and Carol Thom who were urging the officers to shoot them, and refusing to come to the officers' location. A volley of gunfire from the hillside forced the officers to retreat immediately.[3] Officer Walker returned the fire, aiming at a suspect Walker thought to be wearing a red shirt, as appellant had for part of the evening. A subsequent round of fire resulted in another officer, Perkins, being wounded in

---

[3] All three defendants tried together in this case were acquitted of the attempted murder charges related to these two officers. Appellant and Norma Jean Croy were convicted of assault with a deadly weapon on these officers.

his right hand. This same volley of shots missed Officer Walker, who was stationed behind Cloyd's police vehicle. Shots did, however, hit several parts of the car.[4] Thom and Alford were taken into custody when they finally responded to the officers' directions that they quiet down and surrender. They continued to shout to the threesome on the hill periodically, urging that they "kill the pigs." It was eventually necessary to remove them as they were interfering with the attempts of Officer Callahan to communicate with the persons on the hill.

The three persons on the hill did not immediately respond to Officer Callahan who used an amplified microphone on his patrol car to communicate with them. Cloyd testified he then heard Darrell Jones ask appellant, "How's the ammo holding out?" and a male voice replied, "I'm running low." Jones then said, "Give me the gun. I want to shoot for a while," but Cloyd did not recall hearing a response.

After Perkins was wounded, and Alford and Thom had been taken into custody, there was a lull in the firing from the hill. Officers Cloyd and Hittson moved to the cabin which was one of several buildings clustered near the foot of the hillside. Their purpose was to try to locate or apprehend a person the officers believed had traversed the hillside where the remaining three suspects had been, and had gone over a ridge. In the meantime Callahan had established a dialogue with Darrell Jones, and was encouraging him to surrender. Jones told Callahan that he and Norma Jean Croy had been wounded, but when advised that medical care would be provided if he came down, he said he would need a half hour. He repeated that statement, but did not respond when Callahan asked him why he needed that much time. It was shortly after this that Officer Hittson was shot as he left the shelter of the cabin and moved toward one of the outbuildings. The shot was fired from the location of these buildings, not from the hillside. After Cloyd called out that Hittson had been killed, Darrell Jones yelled from the hillside, asking: "Hooty? Where is Hooty? Have you killed Hooty?" "Hooty" is appellant's nickname.

Approximately 15 minutes later officers saw movement near one of the outbuildings and ordered the person to come out. A burst of shots followed, after which appellant called out that he had been shot. He was taken into custody when he crawled out from behind the building and was taken by ambulance to a local hospital from which he was transported to Rogue Hospital in Medford, Oregon, for further treatment. Upon his arrival there, when separately asked, "What happened" by two physicians in the emer-

---

[4]Appellant and Norma Jean Croy were convicted on the attempted murder counts involving these two officers and on the related assault with a deadly weapon counts.

gency room, he replied, "I got shot. I was trying to rob a liquor store," and "I got shot trying to rob a liquor store."

Appellant's rifle was located under an old stove behind that building, loaded with three rounds of .22 magnum semi-jacketed Winchester Western Super X shells, one of which was in the chamber. Bullet casings of this type were found at that location, in the location from which the shot that killed Hittson had been fired, and on the hillside. No other firearm was found on the hill. The bullet that killed Hittson was, in the opinion of a forensic expert, fired from appellant's rifle as were the casings. The single identifiable fingerprint on the rifle was that of appellant. Although appellant testified that he did not intend to shoot Officer Hittson, and did not know if he had done so, his counsel conceded in closing argument that he had the gun and that appellant had testified "in effect" that he was the person responsible for the death of the officer.

*Discussion*

*The Robbery Conviction*

 The prosecutor urged the jury to convict appellant of robbery on either of two theories, arguing that he was an active participant in the robbery or at least had aided and abetted Norma Jean Croy in robbing John Thurman at the Sports and Spirits Liquor Store. At the request of the prosecutor the judge instructed the jury, in the language of CALJIC Nos. 3.00 and 3.01 as they then read, that principals to a crime include all "those who, with knowledge of the unlawful purpose of the one who does directly and actively commit or attempt to commit the crime, aid and abet in its commission . . . , or . . . [t]hose who, whether present or not at the commission or attempted commission of the crime, advise and encourage its commission. . . . A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages, or instigates by act or advice the commission of the crime."

This court subsequently held that these aiding and abetting instructions were erroneous because they did not advise the jury that conviction as an aider and abettor required not only that the defendant have knowledge of the criminal purpose of the perpetrator of the offense, but also that the defendant share that purpose or intend to commit, encourage, or facilitate

the commission of the crime. ■ ■■■ (*People* v. *Beeman, supra,* 35 Cal.3d 547, 560.)[5]

Because *Beeman* resolved a conflict among decisions of the Court of Appeal, that decision applies to cases not yet final at the time of that decision. (*Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24, 37-38 [196 Cal.Rptr. 704, 672 P.2d 110].) ■ ■■■ Appellant contends that in the circumstances of this case the error is necessarily prejudicial.[6]

■ In *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], cert. den. 469 U.S. 1229 [84 L.Ed.2d 366, 105 S.Ct. 1229], this court considered the question of prejudicial error in failing to instruct on intent as an element of an offense. The trial court had failed to instruct the jury, pursuant to *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], that proof of intent to kill was essential to finding a felony-murder special circumstance (§ 190.2, subd. (a)(17).) We concluded there that because the intent element of the felony-murder special circumstance was indistinguishable from an element of an offense, the omission denied due process under the Fourteenth Amendment by relieving the

---

[5]The requirement that the jury determine the intent with which a person tried as an aider and abettor has acted is not designed to ensure that his conduct constitutes the offense with which he is charged. His liability is vicarious. Like the conspirator whose liability is predicated on acts other than and short of those constituting the elements of the charged offense, if the acts are undertaken with the intent that the actual perpetrator's purpose be facilitated thereby, he is a principal and liable for the commission of the offense. Also like a conspirator, he is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. (*People* v. *Beeman, supra,* 35 Cal.3d 547, 560.) "'*One may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it.* [Citations.] *Moreover, the aider and abettor in a proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable consequences of any act that he knowingly aided or encouraged. Whether the act committed was the natural and probable consequence of the act encouraged and the extent of defendant's knowledge are questions of fact for the jury.*'" (*People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198], italics in original.)

It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which *Beeman* holds must be found by the jury. (*People* v. *Beeman, supra,* 35 Cal.3d 547, 556.)

[6]Respondent argues that while it may have been error to give that version of CALJIC No. 3.01, appellant waived his current objection by failing to make it below. We reject this assertion. Section 1259 states, inter alia, "The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (See *People* v. *Harris* (1981) 28 Cal.3d 935, 956 [171 Cal.Rptr. 679, 623 P.2d 240]; accord, *People* v. *Hannon* (1977) 19 Cal.3d 588, 600 [138 Cal.Rptr. 885, 564 P.2d 1203].)

People of the necessity to prove every element of an offense beyond a reasonable doubt. (36 Cal.3d at pp. 550-552.) The error therefore was prejudicial and reversible error per se in the absence of a basis on which to conclude that it had not affected the verdict, because the error "completely eliminated the issue of intent to kill from the consideration of the jury." (*Id.*, at p. 554.)

Our conclusion in *Garcia*—that failure to instruct on intent as an element of a crime is generally prejudicial and reversible per se—was premised squarely upon principles enunciated by the United States Supreme Court in *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969]. While the latter case involved a conclusive presumption instruction, requiring the jury to presume the element of the crime from the existence of some other fact, we found the high court's reasoning with respect to the prejudicial impact of that error to be logically indistinguishable from the reasoning applicable to the determination of prejudice resulting from a failure to instruct the jury that its finding on an essential element of the offense is required for conviction. (*People* v. *Garcia, supra,* 36 Cal.3d at p. 554.)

In *Garcia,* we identified only four exceptions to the reversible error per se rule, in the *Carlos* context. Two of these derived from the United States Supreme Court's decision in *Connecticut* v. *Johnson, supra,* 460 U.S. 73, 87 [74 L.Ed.2d 823, 834]: (1) "if the erroneous instruction was given in connection with an offense for which the defendant was acquitted and if the instruction had no bearing on the offense for which he was convicted," and (2) "if the defendant conceded the issue of intent." The remaining exceptions identified in *Garcia* were found in prior decisions of this court: (3) where "it is possible to determine that although [the] instruction was erroneously omitted, the factual question posed by the [omission] was necessarily resolved adversely to the defendant under other, properly given instructions . . . in another context" (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913]), and (4) when "the parties recognized that intent to kill was in issue, presented all evidence at their command on that issue, and in which the record not only established the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration" [the *Cantrell-Thornton* exception]. (*People* v. *Garcia, supra,* 36 Cal.3d 539, 556.)

In *Beeman* cases, as in *Carlos* cases, the error consists of failing to instruct the jury that it must find a particular intent in order to find guilt, and to that extent the analysis of prejudice is the same. There is an important difference, however: the instruction condemned in *Beeman,* unlike the pre-*Carlos* special circumstance instructions, did not entirely remove the question of the defendant's mental state from the jury's consideration. Former

CALJIC No. 3.01, while containing the flaw discussed in *Beeman,* nonetheless informed the jury that the defendant's state of mind was relevant to the aiding and abetting question, explaining that the defendant must have aided the perpetrator *with knowledge of the perpetrator's unlawful purpose* in order to be found guilty as an aider and abettor.

This difference justifies an adaptation, in the *Beeman* context, of the *Cantrell-Thornton* exception retained in *Garcia:* the parties at least recognized that the defendant's state of mind was at issue, so that a defendant who only accidentally or unintentionally aided the commission of a crime, or otherwise acted without the requisite intent, had a substantial incentive to place such evidence before the jury, frequently in conjunction with a claim that he had no knowledge of the perpetrator's unlawful purpose. ▮ ▮▮ Thus, in many cases there may be no unfairness in assuming— for purposes of appeal and subject to the filing of a petition for writ of habeas corpus containing allegations to the contrary[7]—that the record as made is no different from the record that would have been made had the defendant known that the more precise instruction required by *Beeman* should be given. Since, under former CALJIC No. 3.01, the jury could convict a defendant on an aiding and abetting theory only if it found that he acted with knowledge of the perpetrator's criminal intent, it may be possible in those cases for a court to determine that the *Beeman* error could not possibly have affected the verdict—i.e., that no reasonable trier of fact, having actually found the requisite knowledge, could at the same time have concluded that the defendant did not act for the purpose of facilitating or encouraging the crime. In those cases the judgment could be affirmed.

▮ In this case, however, none of the four *Garcia* exceptions, including the *Cantrell-Thornton* exception, would justify affirmance of the judgment. Appellant was not acquitted of the offense to which the aiding and abetting instructions related; he did not concede at trial that he acted with the intent to facilitate the robbery;[8] and, because the erroneous instructions were given with respect to the special circumstance allegations as well as to the robbery and murder charges, the jury never necessarily found, in any context, that he had acted with the requisite intent. Finally, neither the *Cantrell-*

---

[7] If because of prior decisions interpreting section 31, or approving CALJIC Nos. 3.00 and 3.01, a defendant failed to offer evidence of intent, evidence that would have been objectionable as irrelevant under those decisions, he was to that extent denied the opportunity to present evidence relevant to his defense. When a defendant has been precluded from presenting evidence on a key defense, a claim that he has thereby been denied due process is cognizable on habeas corpus. (See *In re Harris* (1961) 56 Cal.2d 879, 880 [16 Cal.Rptr. 889, 366 P.2d 305].)

[8] To the contrary, appellant offered evidence through emergency room personnel at the Medford hospital that they had not heard him make any statement while under treatment there to the effect that he had been shot trying to rob a liquor store.

*Thornton* exception as described in *Garcia,* nor the more expanded test described above would justify affirmance because, even assuming that the record as it stands contains all the evidence that existed on the issue of intent, that evidence is such that it might have created a doubt in the mind of a reasonable juror as to whether appellant acted with the requisite purpose of facilitating the robbery.

Appellant presented evidence through credible, neutral witnesses that he did not make the statements, attributed to him by emergency room personnel, acknowledging that he had been shot while committing a robbery. There was no evidence that defendant participated in any act in the store which aided the theft of the shells from the display on the counter. In fact there was no evidence that he was even in the store at the time the assault on Thurman and theft of the shells were committed. When Thurman ran from the store he observed someone, probably defendant, already outside the store, standing next to the car. The only evidence of defendant's actions inside the store was that he entered, engaged in a minor verbal squabble with Thurman before Norman Jean and Carol entered, and spoke with them and his other companions after they entered. And, of course, there was evidence that throughout these events defendant may have been intoxicated.

Furthermore, under the instructions given in this case, the jury was permitted to find appellant guilty of the robbery on an aiding and abetting theory if he knew that his companions had committed a robbery at the time he drove them away from the store, even if he had not known of their intent to commit the robbery before the ammunition was taken.[9] Indeed, the prosecutor specifically argued to the jury that it could convict appellant on just such a theory.[10] Because the act of driving away from the scene obviously

---

[9]Because appellant has not challenged these instructions on this appeal, we have no occasion here to determine whether an individual who has no prior knowledge of a robbery but who, after the property has been taken, knowingly helps a robber—who has not reached a place of safety—make his escape, may properly be classified as an aider and abettor rather than an accessory after the fact. (See § 32; *People* v. *Hoover* (1974) 12 Cal.3d 875, 879 [117 Cal.Rptr. 672, 528 P.2d 760]; cf. *People* v. *Jardine* (1981) 116 Cal.App.3d 907, 916-922 [172 Cal.Rptr. 408].)

[10]"It doesn't matter if Patrick Croy took the ammunition. Let's assume that Norma Jean Croy took the ammunition. Let us assume even that Norma Jean Croy took that ammunition without any discussion with Patrick beforehand. What does that do to the prosecution's contention that Patrick Croy is guilty of felony murder, robbery? Norma Jean Croy forced the clerk out of the store with a knife or can opener or whatever with force. She took the bullets, coincidentally got the right kind. If she had the intent to grab the bullets when she forced the clerk out of there and she had put the bullets in her pocket, she had completed a robbery. The court will tell you a robbery is not complete or ended until everybody gets to a place of safety. When she comes out and says to Patrick, 'Patrick, let's get out of here. I just ripped off the bullets. The clerk is going to come. Let's get out of here. Anyplace. We've got to get to someplace where it's safe so we don't get arrested.' The robbery is in progress. Patrick Croy is driving the car away from the scene of this robbery. They never reach a place of temporary safety."

"aided" the robbery, the erroneous aiding and abetting instructions made it irrelevant whether appellant had driven away from the scene for the purpose of facilitating the robbery or for some other purpose.

Although, as discussed above, in many cases there may be no plausible basis on which the jury could find that the defendant acted for another purpose, in this case there was evidence that would support such a finding. During his testimony, appellant explained that when his friends emerged from the store after the altercation with the owner, he became concerned when he saw the police because he was on probation and was afraid that he would be arrested for being drunk. He stated that that was the reason he had driven away from the police and had attempted to avoid apprehension. Although the jury might well, of course, have disbelieved this testimony, it cannot be dismissed as "not worthy of consideration." On this record, we cannot say that the evidence establishes as a matter of law that, even assuming appellant knew of the perpetrator's unlawful intent, he aided them with the intent of facilitating the commission of the robbery, nor can we say that, properly instructed, no reasonable juror could fail to find that defendant acted with the purpose of facilitating a theft or robbery.

Accordingly, in this case the *Beeman* error requires reversal of the robbery conviction.

### The Murder Conviction

■ Appellant contends the reversal of the robbery conviction necessitates reversal both of the first degree murder conviction, and the special circumstances. Under applicable principles, we are compelled to agree. Since robbery was the only possible predicate in this case for felony murder—which may have been the basis for appellant's first degree murder conviction—the latter conviction must also fall, absent any independent finding by the jury appellant harbored malice aforethought. Respondent counters that the jury did find appellant possessed malice aforethought, in two distinct ways. Respondent is in error.

■ First, respondent contends that since the jury found appellant guilty of conspiracy to commit first degree murder—a conviction we affirm, *infra*—implicit in this conviction was a finding that appellant harbored malice aforethought when he killed Officer Hittson. The conclusion does not follow from the premise. The conspiracy verdict confirms that the jury found that defendant harbored malice at the time the conspiracy was formed, but absent a basis on which to conclude that the subsequent acts were undertaken in furtherance of the conspiracy, it establishes nothing more. The record does not compel a conclusion that the shots fired at the pursuing officers at the

Croy cabin were fired in furtherance of the conspirator's goal, and we cannot conclude that the jury found malice on that basis.

It was between 10 p.m. and 11 p.m. that the conspiracy was initiated, on the prosecutor's theory, by the suggestion to "shoot the sheriff." Twenty-three acts in furtherance of the conspiracy were alleged, most of which took place long before the killing. To establish the existence of a conspiracy to commit murder, of course, all the jury was required to find was that at some point along this continuum, the intent to commit murder was possessed simultaneously with the commission of any of these overt acts. Because there was no finding required as to which of these acts constituted the overt act leading to the conspiracy conviction, we cannot know the length of the period during which the jury found appellant possessed malice aforethought, or any of the other mental states requisite to a murder conviction. Thus, it is far from certain that by convicting appellant of conspiracy to commit murder under the prosecution's theory, the jury necessarily determined appellant possessed malice aforethought when, early the following morning, Officer Hittson was killed.[11] The conspiracy conviction, without more, cannot provide the predicate for appellant's first degree murder conviction.

██ Respondent next points to the jury's finding that the special circumstance that appellant committed murder in the course of a robbery was true.

---

[11]Although ambiguous, the record indicates that the first degree murder verdict was, indeed, based on the felony-murder theory offered by the prosecutor, and that the jury did not necessarily conclude that it was a product of the conspiracy or consider the malice element of the conspiracy charge relevant to finding first degree murder under a theory that the murder of Officer Hittson was a wilful and premeditated murder.

The verdict forms reveal that the jury reached a verdict on the first degree murder count on June 22, having reached its verdict on the robbery the prior day. The conspiracy verdict was not reached until June 27.

A further reason to doubt that the malice found to exist at the time the conspiracy was formed, was found to persist at the time of the gunbattle is in the verdicts *acquitting* both Patrick and Norma Jean Croy of attempted murder of Officers Cloyd (who was one of the pursuing officers at whom a shot was fired from the car occupied by defendants, and who was also among the officers at whom shots were fired from the hillside) and Quigley (who was also at the hillside cabin), and in the verdicts *convicting* these two defendants of assault with a deadly weapon on those two officers as well as on Officers Perkins and Walker who were at the cabin. The verdicts convicting the defendants of attempted murder of the last named officers reflect the jury's determination that appellant's intent and mental state were not the same throughout the events at issue.

The nature of these verdicts renders the suggestion of the dissent that the malice necessary to support a murder verdict should be inferred from the conspiracy conviction insupportable. The acquittal of two of the four attempted murder counts is inconsistent with a conclusion that the jury concluded that appellant's actions in firing at the officers from the hillside were undertaken in furtherance of a conspiracy to kill police officers, and therefore permits a conclusion that malice can be found as a matter of law.

We can speculate, but we cannot *know* why the jury concluded that the defendants shot at some of the officers with malice and intent to kill, and did not find either or both of those elements present when they shot at the other officers. The verdicts preclude any assurance that the jury believed that any particular shot was related to the conspiracy.

This determination was made pursuant to an instruction which required the jury to find the killing was "willful, deliberate, and premeditated." Thus, respondent asserts, the jury necessarily found appellant possessed the state of mind required to convict appellant of first degree murder. This proposition, however, is inconsistent with substantial authority that clearly establishes malice as a mental state distinct from wilfulness, premeditation, or deliberation.

In *People* v. *Conley* (1966) 64 Cal.2d 310, 316-322 [49 Cal.Rptr. 815, 411 P.2d 911], we surveyed precedent spanning several decades in support of our pronouncement that under our Penal Code malice aforethought is to "be distinguished from that state of mind described as 'wilful, deliberate, and premeditated . . . .'" (*Id.*, at p. 321; accord, *People* v. *Sedeno, supra,* 10 Cal.3d 703, 722, citing *People* v. *Holt* (1944) 25 Cal.2d 59, 70 [153 P.2d 21].) ■ Malice, we stated, is characterized by the exhibition of "wanton disregard for human life or antisocial motivation . . . ." (*People* v. *Conley, supra,* 64 Cal.2d at p. 322.) More precisely, "[a]n intentional act that is highly dangerous to human life, done in disregard of the actor's awareness that society requires him to conform his conduct to the law, is done with malice." (*Ibid.;* accord, *People* v. *Poddar* (1974) 10 Cal.3d 750, 759-760 [111 Cal.Rptr. 910, 518 P.2d 342], where this court wrote that in assessing whether malice may properly be implied, a finder of fact must embark on a tripartite inquiry. "First, was the act or acts done for a base, antisocial purpose? Second, was the accused aware of the duty imposed upon him not to commit acts which involve the risk of grave injury or death? Third, if so, did he act despite that awareness?" See also, *People* v. *Love* (1980) 111 Cal.App.3d 98, 108 [168 Cal.Rptr. 407].)[12]

■ Malice, then, is quite different from the "state of mind described as 'wilful, deliberate, and premeditated.' . . . The latter phrase encompasses the mental state of one who carefully weighs the course of action he is about to take and chooses to kill his victim after considering reasons for and against it. [Citation.]" (*People* v. *Conley, supra,* 64 Cal.2d at pp. 321-322.) While we have recognized that in most circumstances "[a] person capable of achieving such a mental state is normally capable also of comprehending the duty society places on all persons to act within the law" (*id.*, at p. 322), there are situations where this is not so. "If," for example, "because of mental defect, disease, or intoxication . . . the defendant is

---

[12]In 1981, the Legislature amended section 188 to delete from the definition of malice "[a]n awareness of the obligation to act within the general body of laws regulating society." In 1982, the provision was amended once more, to state that acting despite such awareness is also not included in the definition of malice. These amendments were enacted after appellant committed his alleged offenses, and we pass no judgment regarding what the term malice aforethought denotes in light of these revisions.

unable to comprehend his duty to govern his actions in accord with the duty imposed by law, he does not act with malice aforethought and cannot be guilty of murder in the first degree." (*Ibid.*) Thus, the argument "that a defendant who has deliberated, who has carefully weighed his course of action and has considered the reasons for and against it, must have considered among those reasons the fact that it is unlawful and that he is obliged to act within the law," has been rejected by this court. (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 723; accord, *People* v. *Conley, supra,* 64 Cal.2d 310, 322-323;[13] *People* v. *Henderson* (1964) 60 Cal.2d 482, 490-492 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492]; *People* v. *Bender* (1945) 27 Cal.2d 164, 180 [163 P.2d 8].)

These well-established principles compel us to reverse the murder conviction in the case before us. While the jury was instructed properly on the definition of malice and the fact that evidence of diminished capacity could rebut the inference that one who commits life-endangering acts does so with malice aforethought, the jury need not have considered these instructions when convicting appellant of first degree murder if they relied on the prosecution's felony-murder theory. Absent some conclusive basis for assuming the jury did take these instructions into account, and nonetheless determined appellant "capable of comprehending his duty to conform his conduct to the law and after weighing that obligation made a reasoned decision to kill" (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 724), the question of whether appellant harbored malice, a discrete element of the crime of murder, cannot be said necessarily to have been answered by the jury.

Indeed, on our review of the record, this is a question whose answer was clouded by substantial doubt. Appellant submitted a good deal of evidence in support of his diminished capacity defense, ranging from testimony by psychologists and social workers of appellant's alcoholic tendencies and previous experiences with drug and alcohol-induced "blackouts," to testimony by appellant and his companions of the prodigious amount of mind-altering substances appellant consumed for a period of three days preceding the shooting. While the jury impliedly rejected this defense to the extent it found appellant capable of lifting a rifle, aiming, and firing at Officer Hitt-

---

[13]Strictly speaking, the issues in *Sedeno* and *Conley* were different from the one presented here. The question in *Sedeno* was whether the failure to give involuntary manslaughter instructions constituted prejudicial error where there was evidence before the jury to negate a finding defendant harbored malice. In *Conley,* we were asked whether manslaughter instructions were mandatory where defendant presented evidence from which the jury could infer his intoxication so diminished his capacity to appreciate the criminality of his conduct that he was incapable of acting with malice aforethought. The rationale underlying both opinions, however, applies with equal force here: the jury must consider how the relevant evidence bears on each element of the offense charged before a defendant may lawfully be convicted.

son with the intent to kill him, the fact that appellant was able to entertain the intent to kill his victim does not preclude the possibility, far from unlikely here, that as a result of appellant's intoxication he was incapable of recognizing his obligation to adhere to society's laws. In light of the uncontradicted authority mandating the potentially critical distinction between malice and the triad of wilfulness, premeditation, and deliberation, and the chance the jury sentenced appellant to die without considering the impact of any of the possible effects of appellant's alleged intoxication on his ability to harbor malice, appellant's murder conviction, and the special circumstance findings, cannot be permitted to stand.

### Instructions on Attempted Murder

 Appellant next asserts prejudicial error was committed by the trial judge when, in instructing the jury on the elements of attempted murder, he referred the jury to definitions of murder which included felony murder. We agree.

Appellant had been charged with that crime with respect to several police officers in connection with the shoot-out on the hillside. The instruction on attempted murder was: "The defendants are jointly accused of the crime of Attempted Murder in Counts Three, Four, Five, and Six of the Information. You have previously been instructed in the definition of the crime of Murder. [¶] The crime of Attempted Murder, therefore, consists of two elements, namely a specific intent to commit the crime of Murder and a direct but ineffectual act done toward its commission. [¶] Like the offenses of Murder and Conspiracy to Commit Murder, you must apply all of the instructions you have already been given to determine whether the Attempted Murder, if any, was Attempted Murder of the First Degree or Second Degree, or whether it was an Attempted Voluntary Manslaughter."

The instructions which the court had previously delivered concerning the offense of murder, and which the court directed the jury to apply in determining appellant's guilt of attempted murder, included the definition of implied malice, first degree felony murder, first degree felony murder in furtherance of a conspiracy, and second degree murder.

Thus, the instructions incorrectly incorporated principles of murder which do not require a finding of malice or specific intent to kill into an offense, attempted murder, in which these are necessary elements. As in *People* v. *Ramos* (1982) 30 Cal.3d 553, 583 [180 Cal.Rptr. 266, 639 P.2d 908], "[t]he court neglected . . . to inform the jury that the crime of attempted murder requires a specific intent to kill. . . . The jury instructions thus implied that the jury could find appellant guilty of attempted murder if it

determined that appellant intentionally committed an act which, were the victim to die, would constitute murder on an implied malice or felony-murder theory. As we explained recently in *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 764 [175 Cal.Rptr. 738, 631 P.2d 446], such instructions are inadequate.''

Respondent argues that since appellant necessarily was convicted of the wilful, deliberate, and premeditated murder of Officer Hittson, as was necessary under the instruction given regarding the special circumstance of murder committed in the course of a robbery, appellant must have been found by the jury to have possessed the same intent with respect to the officers he did not kill. This argument is without merit. We are not entitled to conclude as a matter of law, that because the jury found that at one point in time appellant possessed an intent to commit a crime directed at a specific person, that intent necessarily continued, nor can we conclude that the jury necessarily determined he harbored identical intent with respect to different persons at an earlier juncture. As we explained above no like intent need have been found here. In addition to the doubt cast on that possibility by the pattern of the verdicts is the actual defense proffered by appellant which included a claim that he was startled when Hittson appeared as he was trying to find safety in his grandmother's cabin, and that if he shot Hittson he did not intend to. Further, since the jury did not find appellant guilty of attempted murder of Officers Cloyd and Walker at whom the first volley of shots was fired it recognized that this incident and the subsequent round of firing were not similarly motivated. The circumstances of the murder of Officer Hittson were quite different from those earlier in which appellant fired from the hillside.

Since one of the prosecutor's principal theories was that Officer Hittson was killed during the flight from the robbery it is not only possible, but probable that the jury relied on this theory in convicting appellant of first degree murder and did not find it necessary to even consider whether appellant acted with malice. Thus we cannot conclude on the basis of the murder verdict that the jury considered either intent to kill or malice in returning the attempted murder verdicts.

For this reason, the attempted murder conviction must also be reversed.

*The Conspiracy Conviction*

Appellant does not challenge his several convictions of assault with a deadly weapon, and we affirm the jury's verdict on these counts.

And while appellant contests the validity of his conspiracy conviction—raising three arguments challenging instructions he charges enabled the jury to convict him without necessarily finding each of the elements of the target crime of murder had been satisfied—we reject these contentions, and affirm this conviction as well.

In connection with the charge of conspiracy to commit murder, the trial judge delivered two key instructions which appellant contends may have misled the jury to his prejudice. In defining the offense of conspiracy to commit murder, the court delivered a modified version of CALJIC No. 6.10, which stated in relevant part: "A conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit the public offense of murder and with the further specific intent to commit such offense, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement."

The court also delivered a special instruction regarding the relationship between diminished capacity and the charge of conspiracy to commit murder. This instruction read: "The defendants are jointly charged in Count Two with the offense of Conspiracy to Commit Murder. You have previously been instructed as to your duty to determine whether any defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication or any other cause with respect to the offense of Murder as alleged in Count One. Similarly, you have been given instructions concerning the effect, if any, this diminished capacity had on the defendants' capacity to form any of the specific mental states that constitute the essential elements of murder and manslaughter. [¶] In connection with the offense of Conspiracy to Commit Murder, you must determine whether there was a conspiracy, and if so, whether the conspiracy was to commit first degree murder, second degree murder, voluntary manslaughter or involuntary manslaughter. [¶] Hence, if the defendants, due to diminished capacity caused by intoxication, did not have the capacity to form the mental state necessary to premeditate murder, they cannot be found guilty of conspiracy to commit first degree murder, but may be found guilty of conspiracy to commit second degree murder. [¶] If the defendants, due to diminished capacity caused by intoxication, did not have the capacity to form the mental state necessary to harbor malice aforethought, they cannot be guilty of conspiracy to commit murder, but may be guilty of conspiracy to commit voluntary manslaughter. [¶] Finally, if the defendants, due to diminished capacity caused by intoxication, did not have the capacity to form the mental state necessary to harbor malice aforethought and intention to kill, they cannot be guilty of conspiracy to commit voluntary manslaughter, but may be guilty of conspiracy to commit involuntary manslaughter."

First, appellant contends that because no additional instructions regarding murder or manslaughter were delivered in this context, the jury was left to refer to previous instructions regarding those offenses, which included instructions on felony murder. This, the argument runs, permitted the jury to convict appellant without necessarily concluding appellant possessed the state of mind requisite to a finding he intended to commit the target crime of murder.

In support of this argument appellant points out that conspiracy "is a 'specific intent' crime. (*People* v. *Marsh* (1962) 58 Cal.2d 732, 743 [26 Cal.Rptr. 300, 376 P.2d 300]; *People* v. *Aday* (1964) 226 Cal.App.2d 520, 533 [38 Cal.Rptr. 199]; *People* v. *Bernhardt* (1963) 222 Cal.App.2d 567, 586 [35 Cal.Rptr. 401]; *People* v. *Bowman* (1958) 156 Cal.App.2d 784, 797 [320 P.2d 70].) The specific intent required divides logically into two elements: (a) the intent to agree, or conspire, and (b) the intent to commit the offense which is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of that offense." (*People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300].) One of these elements, of course, is malice aforethought, a state of mind implied from the commission of the underlying felony in the felony-murder arena, but not necessarily found to have been possessed by the perpetrator. Thus, appellant asserts, the jury may not have found he harbored malice aforethought if, in convicting appellant of conspiracy to commit murder, the jury relied on the previously delivered instructions on felony murder.

We are not persuaded. It is unlikely that the jury depended on the alleged robbery to imply the malice aforethought necessary to the conspiracy conviction, given that robbery was not one of the overt acts alleged in the conspiracy count, and the prosecution argued the conspiracy was complete long before the robbery, let alone the killing, took place. In any event, the challenged instructions did, in our view, adequately convey to the jury the necessity of finding appellant harbored malice at the time he committed an overt act in furtherance of the conspiracy. Admittedly delivered for the purpose of describing the impact of the diminished capacity defense on various degrees of criminal homicide, rather than to delineate the elements of murder, the instructions nonetheless clearly state, "If the defendants, due to diminished capacity, caused by intoxication, did not have the capacity to form the mental state necessary to harbor malice aforethought, they cannot be guilty of conspiracy to commit murder." Few statements could be more plain. If any juror was inclined to convict appellant of conspiracy to commit

murder without finding malice aforethought, this instruction, combined with the one that ensued,[14] must have disabused him of any such inclination.[15]

Next, appellant asserts that because the instructions quoted above failed to include any reference to the element of "deliberation," the jury was allowed to convict appellant of conspiracy to commit first degree murder without necessarily determining he possessed that mental state.

Any force this argument might have had is undercut by the fact that when the trial judge delivered earlier instructions on murder, he adequately instructed on each of the elements of murder, including deliberation, and the prosecutor again advised the jury that this mental state was in issue in the conspiracy charge. While in other contexts the jury might have considered the felony-murder instructions relevant to the conspiracy count, the instructions here adequately foreclosed reference to felony murder as a predicate for conviction by, inter alia, requiring the jury to determine appellant possessed malice aforethought. Thus, appellant's second attack on the adequacy of the conspiracy instructions is meritless.

So, too, with his third challenge to that conviction, for similar reasons. Appellant argues that because of possible reference to earlier felony-murder instructions, the jury may have wrongfully convicted him of conspiracy to commit first degree murder without finding intent to kill. We have already seen, however, that the judge specifically stated the jury needed to find intent to kill before appellant could be convicted of conspiracy to commit voluntary manslaughter, and by clear implication, conspiracy to commit murder. Hence, we affirm appellant's conviction of conspiracy to commit first degree murder.

### Conclusion

The judgment of conviction of conspiracy (count 2) and assault with a deadly weapon on a peace officer with use of a firearm (counts 7, 8, 9 and 10) is affirmed and defendant is remanded for resentencing on these counts. The judgment of conviction of murder with special circumstances (count 1), robbery (count 11), and attempted murder (counts 4 and 6) is reversed.

Broussard, J., Reynoso, J., and Kaus, J.,* concurred.

---

[14]"Finally if the defendants . . . did not have the capacity to form the mental state necessary to harbor malice aforethought and intention to kill, they cannot be guilty [even] of conspiracy to commit voluntary manslaughter . . . ."

[15]This advice was echoed by the prosecutor in his closing argument when he reminded the jury that "the instructions concerning the mental capacities, the capacity to premeditate, the capacity to deliberate, the capacity to harbor malice apply equally to the conspiracy to commit murder. . . . [I]f you find because of involuntary intoxication . . . they couldn't harbor . . . malice . . . the lesser offenses might be brought into play."

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

Bird, C. J., concurred in the judgment only.

**LUCAS, J.,** Concurring and Dissenting.—I concur in the judgment to the extent it affirms defendant's convictions of conspiracy to commit first degree murder, and of assault with a deadly weapon. For the reasons stated in Justice Mosk's dissenting opinion, however, I would also affirm the convictions of murder with special circumstances and attempted murder. The evidence of defendant's guilt of those offenses was overwhelming.

Finally, unlike either the majority or Justice Mosk, I would also affirm defendant's robbery conviction despite so-called *Beeman* error. (See *People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) As I will demonstrate, the evidence which indicated that defendant aided and abetted a robbery with an intent to facilitate, or assist in facilitating, that offense was likewise overwhelming.

My colleagues in the majority properly decline to apply a reversible per se standard for measuring the prejudicial effect of *Beeman* error. (See *People v. Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826] [reversible per se standard for *Carlos* error in capital cases].) I agree that such a strict standard would be unnecessary in these cases, being compelled by neither logic nor constitutional mandate. First, we must bear in mind that *Beeman* "error" is quite harmless in many cases: Rather than requiring a finding of intent to commit or assist in a crime, the pre-*Beeman* instruction called for a finding of aiding, promoting, encouraging or instigating the commission of a crime "with knowledge of the unlawful purpose of the perpetrator . . . ." As the majority acknowledges, in many cases, anyone who "aided" or "promoted" a criminal act, knowing of the perpetrator's unlawful purpose, also intended to commit, or at least assist in committing, that act. The majority, however, incorrectly holds that no such conclusion can be drawn in the present case.

The majority concedes that, at the outset, defendant joined a criminal conspiracy to "shoot the sheriff." Defendant, to promote that end, announced that he was "gonna get a gun." He and several of his companions stopped at his apartment and picked up his rifle, but he could not find any bullets. He left the apartment, armed with the rifle, angrily remarking that his girlfriend, Barbara Conrad, "wouldn't give him no shells."

The group, continuing to discuss "get[ting] some cops," drove to a sporting goods and liquor store where ammunition was sold; defendant bought some beer and argued with the clerk about his change. After leaving the store, the group reentered around midnight, and defendant resumed his pre-

vious altercation with the clerk. While the clerk was being distracted and assaulted by various members of the group, one of them stole several boxes of .22 magnum ammunition fitting defendant's rifle. The group then fled, ultimately pursued by the police. Defendant was driving the "getaway" car. (His testimony to the effect that he drove away merely because he was afraid of being arrested *for drinking* was inherently unbelievable.)

At the conclusion of the ensuing gunfight, after defendant had shot and killed Officer Hittson and had been wounded himself, defendant announced to attending physicians that he had been shot trying to "rob" a liquor store.

The foregoing evidence was largely uncontradicted by any credible evidence and overwhelmingly demonstrated that defendant aided and abetted a robbery of the store in order to obtain ammunition he needed to fulfill his coconspirators' murderous objective. Although the jury was not told that aiding and abetting required an intent to commit, or assist in committing, a crime, it was told (under the standard pre-*Beeman* instruction) to determine whether defendant aided, promoted, encouraged or instigated the robbery with knowledge of the perpetrator's unlawful purpose. Thus, by necessary implication, the jury must have found that defendant assisted in the robbery knowing of the perpetrator's unlawful purpose. That being so, there can be no reasonable doubt that the jury likewise would have found that he intended to commit, or assist in committing, robbery. He wanted bullets. He got bullets.

I would affirm the judgment in its entirety.

**MOSK, J.**—I dissent from the reversal of the convictions of murder and attempted murder.

On this issue the majority draw some esoteric distinctions that are difficult to comprehend: they uphold defendant's conviction of conspiracy to commit murder, but reverse his conviction of the murder and attempted murder that he conspired to commit and that actually took place.

At the outset, I concede the evidence is too thin to support the robbery conviction. Despite the melee at the liquor store, events there probably did not rise to the level of a robbery. Thus defendant could not be convicted of robbery and necessarily the felony-murder charge based on the robbery must fall. To that extent the majority opinion is sound. It does not follow, however, that defendant was improperly convicted of first degree murder and attempted murder under this evidence. Indeed, it seems to me that the evidence of guilt is overwhelming.

The majority cannot find an adequate showing of malice to justify the first degree murder and attempted murder convictions, despite the fact that the jury found defendant guilty of conspiracy to commit first degree murder, a conviction that must be bottomed on malice. As I read their opinion, the majority concede there was abundant malice when the conspiracy was initiated, but "we cannot know the length of the period during which the jury found appellant possessed malice" (maj. opn., *ante,* at pp. 16-17). In other words, there was malice when the conspiracy to murder was formed at 11 o'clock at night but since the actual murder and attempted murder did not take place until an hour or two thereafter, the malice may have dissipated. In my opinion the nature of the intervening acts demonstrate the malice was continually harbored by the defendant from the beginning of the conspiracy until the final shot was fired at the law enforcement officers.

The conspiracy began when the rowdy group became overtly belligerent and menacing. While the precise male who declared "I'm going to shoot the sheriff" was not identified, it was this defendant who said, "I'm going to get a gun" and who sought ammunition for the gun in his girlfriend's residence. Certainly in that frame of mind at that time of night he was not seeking bullets for mere target practice; a fair inference is that he fully intended to shoot a peace officer and was initiating the process to do so.

From that point to the tragic denouement, there is not a shred of evidence to suggest that defendant's malicious purpose was abandoned. Indeed everything points to the eagerness with which he and his confederates squared off to deliberately shoot and kill the pursuing peace officers. The officers shined high-beam spotlights on the scene and attempted to reason with the group. In refusing the opportunity given for a rational surrender and choosing the alternative of a gangster-type shoot-out, defendant and his confederates clearly demonstrated continued malice. It is fortuitous that only one officer was fatally wounded.

While it would have been preferable for the jury not to be instructed on felony murder based on an alleged robbery that is unsupportable, that error was not prejudicial for there was overwhelming evidence of all the ingredients of first degree murder: a wilful, deliberate and premeditated killing committed with express malice. (Pen. Code, §§ 187-189.) To hold otherwise, the majority must necessarily find the malice that evoked the conspiracy had miraculously dissipated while defendant and his confederates obtained lethal weapons, refused to surrender to the authorities, and maintained a steady barrage of fire at the police officers. That theory is difficult to swallow.

Because the victim was a peace officer, there is no question that the special circumstance requirements of the 1977 death penalty statute were met. (Former Pen. Code, § 190.2, subd. (c)(1).)

I would affirm the judgment in all respects, except as to the robbery count.

Respondent's petition for a rehearing was denied March 20, 1986. Mosk, J., Lucas, J., and Panelli, J., were of the opinion that the petition should be granted.