Filed 5/8/14  P. v. Patton CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>DAISHJON PATTON et al.,<br><br>　　　Defendants and Appellants. | B246498<br><br>(Los Angeles County<br>Super. Ct. No. YA080505) |

　　　APPEALS from judgments of the Superior Court of Los Angeles County, James R. Brandlin, Judge.  Modified in part and affirmed as modified with directions.

　　　Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant Daishjon Patton.

　　　David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant Burke Robinson.

　　　Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

# I.  INTRODUCTION

A jury convicted defendant, Daishjon Patton, of first degree murder as charged in count 1.  (Pen. Code, § 187, subd. (a).)[1]  The same jury also convicted Mr. Patton and a co-defendant, Burke Robinson, of two counts of attempted willful, deliberate and premeditated murder as alleged in counts 2 and 3.  (§§ 664, 187, subd. (a).)  The jury further found true gang benefit and firearm use allegations.  (§§186.22, subd. (b)(1)(C); 12022.53, subds. (b), (c), (d) & (e)(1).)  Mr. Patton was sentenced to 50 years to life in state prison.  The trial court found Mr. Robinson had a prior conviction within the meaning of sections 667, subdivisions (b) through (i) and 1170.12.  Mr. Robinson was sentenced to:  two consecutive life terms on counts 2 and 3; plus a consecutive indeterminate term of 25 years to life on count 2 (§ 12022.53, subd. (d)); and a consecutive determinate 20-year term on count 3 (§ 12022.53, subd. (c)).  We modify the judgments and affirm as modified.

# II.  THE EVIDENCE

## A.  Overview

We view the evidence in the light most favorable to the judgment.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Osband* (1996) 13 Cal.4th 622, 690.)  Mr. Patton and Mr. Robinson were members of a predominantly African-American gang.

The gang's primary activities included murder, attempted murder, assault with great bodily injury, robbery, weapons possession and narcotics sales.  In his cellular telephone, Mr. Patton had a photograph of himself displaying a gang sign.  Mr. Patton also had photographs of Mr. Robinson displaying gang signs.

---

[1] Further statutory references are to the Penal Code unless otherwise noted.

On January 29, 2011, Mr. Patton went into a neighborhood claimed by a rival Hispanic gang. Mr. Patton shot and killed Edwin Perla, a member of the rival Hispanic gang. This is the murder charged in count 1.

On March 7, 2011, Mr. Patton and Mr. Robinson went into a neighborhood claimed by a rival African-American gang. Mr. Robinson shot and attempted to kill two individuals perceived to be rival gang members, Steven Abner and Okeem Ross. These are the attempted murders charged in counts 2 (Mr. Abner) and 3 (Mr. Ross). At the time of the murder and attempted murders, Mr. Patton was 16 years old.

## B. January 29, 2011

### 1. The murder

On January 29, 2011, between 6:15 and 6:27 p.m., Juan Garcia was walking south on New Hampshire Avenue toward 112th Street. The area was claimed by a Hispanic gang. Mr. Garcia saw a friend, Edwin Perla. Mr. Perla was walking towards Mr. Garcia on the opposite side of the street. Mr. Perla was a member of the Hispanic gang. Mr. Perla spoke to Mr. Garcia. Mr. Perla said he was going to the "weed house," a residence on the block where marijuana was sold.

Shortly thereafter, Mr. Garcia encountered Mr. Patton and an unidentified African-American companion. Mr. Garcia recognized Mr. Patton. Mr. Garcia regularly saw Mr. Patton in the neighborhood. Mr. Garcia knew Mr. Patton was a gang member. Mr. Patton was wearing glasses. Mr. Garcia had seen Mr. Patton wearing glasses in the past. Mr. Patton issued a gang challenge to Mr. Garcia. Mr. Patton asked, "Where you from . . . ?" Mr. Garcia said, "I don't bang," and "I ain't from nowhere." Mr. Garcia was asked if he knew where the "weed house" was located. Mr. Garcia pointed Mr. Patton in the direction of the residence where the marijuana was available. Mr. Garcia continued walking south toward 112th Street. But then Mr. Garcia realized Mr. Perla and

3

Mr. Patton were rival gang members.  Mr. Garcia became concerned for Mr. Perla's safety.  Mr. Garcia turned and ran back toward the house where marijuana was sold.

Mr. Patton and the unidentified African-American man confronted Mr. Perla, a rival gang member, near the house.  Mr. Garcia witnessed the encounter.  Mr. Patton asked Mr. Perla, "Where you from . . . ?"  Mr. Perla began to answer.  Then Mr. Patton shot Mr. Perla in the head who then fell to the ground.  Mr. Patton shot Mr. Perla three more times.  Mr. Garcia saw Mr. Patton and the unidentified African-American man run north toward an alley.  Mr. Perla died as a result of multiple .44-caliber gunshot wounds.

Anaberta Renteria was in her apartment near 112th Street and New Hampshire Avenue at the time.  She heard two or three gunshots.  She looked outside.  Ms. Renteria saw two African-American men running fast towards an alley.

Terrell White was standing on his front porch that evening.  Mr. White saw a Latino walk by.  Two or three minutes later, Mr. White saw two young African-American men, about 18 or 19 years old.  One wore a black jacket and glasses.  The other was wearing a dark blue or black "hoodie" with a T-shirt hanging down below his sweatshirt.  The young man wearing the glasses spoke to Mr. White.  Mr. White was asked whether he knew where they could get some weed.  Mr. White said he did not.  The individual responded, "Okay, Blood."  That comment was followed by a gang slur.  Mr. White "felt something . . . wasn't right" and went inside his house to get a gun.  Two minutes later, he heard a gunshot.

2.  The investigation

At 6:35 p.m. on January 29, 2011, someone made an outgoing call from Mr. Patton's cellular telephone.  The call was routed through a cellular tower at 9900 South Vermont Avenue.  The cellular tower was just under a mile by car from the shooting location.  Mr. Patton's cellular telephone had to have been within a mile and one-half of the tower.

4

On February 22, 2011, Mr. Garcia told Detective Q. Rodriguez it was Mr. Patton who shot Mr. Perla. Mr. Garcia used Mr. Patton's gang moniker in making the identification. On February 28, 2011, Mr. Garcia viewed a photographic lineup. Mr. Garcia identified Mr. Patton as the gunman. Mr. Garcia was certain of his identification. According to Detective Rodriguez, Mr. Garcia identified Mr. Patton "within seconds" of viewing the lineup. Detective Rodriguez described Mr. Garcia's identification: "He just sounded sure of himself. He said, 'Right there.'" Mr. Garcia testified: "[I]t didn't even [take] me not even a second, the moment I saw the pictures I was, like, it was the one, it was the upper one . . . . I was, like, 'that's him right there.'" Mr. Garcia also identified Mr. Patton as the gunman at the preliminary hearing and trial. At trial, the parties stipulated that, on June 18, 2012, subsequent to the present crimes, Mr. Garcia was arrested for misdemeanor petty theft.

On March 8, 2011, Detective Rodriguez showed Mr. White a photographic lineup. A photograph of Mr. Patton was in position number five. Detective Rodriguez described Mr. White's actions: "He grabbed the six-pack with two hands, and he looked at it. It appeared to me that he looked at the top row of photographs, then he looked down, looked around the left - - the bottom row of photographs from right to left. And then he went and stopped in the lower middle photograph, which is position number 5." Detective Rodriguez said to Mr. White, "'It appears you're looking at a particular photograph.'" Mr. White said yes, he was looking at number five. Mr. White said number five looked familiar, but he was not certain.

### 3. For the benefit of a criminal street gang

Detective Derek White was the lead investigator in the case. Detective White testified in response to a hypothetical tracking the facts of the January 29, 2011 shooting. Detective White believed the homicide described in the hypothetical crime was committed for the benefit of a criminal street gang.

## C. March 7, 2011

### 1. The attempted murders

On March 7, 2011, in the late afternoon, defendants went into territory claimed by a rival African-American gang. Mr. Robinson issued gang challenges to three individuals in succession. When this occurred, Mr. Patton was standing next to Mr. Robinson. In doing so, Mr. Robinson employed a ruse. Mr. Robinson said he was from the local gang. Detective White testified this tactic is aimed at accomplishing the gang member's goal— to shoot a rival gang member. Mr. Robinson referenced the local gang in order to bait a potential victim into claiming membership in the local gang. As Detective White explained: "[T]hey were baiting in the other gang by [claiming the local gang]. It baits in the other gang member to say, 'Yeah, I'm from [the local gang] too.' And then the assault occurs. [¶] . . . [¶] [The significance of that is] to try to - - if they're going to go into an area of a rival gang member, they want to shoot a rival gang member. It doesn't always work out that way, but their goal is to - - obviously to shoot a rival gang member. [¶] . . . [¶] If a gang member challenges a gang member, they'll usually answer back with their gang because they're proud to be from that gang. So by saying this is [the local gang] - - in situations, investigations I had before, they'll answer back, yeah, I'm so and so from [the local gang], and then the assault happens, where, no, this is [the rival gang] and then they sho[o]t him."

Walking side by side, defendants approached Jonathan Williams. Mr. Williams was in front of his home. Mr. Williams lived on 111th Street between Denker and Normandie Avenues. Mr. Williams testified defendants both looked angry. Mr. Robinson and Mr. Patton were dressed in dark clothing. Mr. Robinson was wearing a black "hoodie" and beanie. Mr. Robinson was also wearing dark blue or black pants. Mr. Patton wore a black hoodie, a blue shirt, possibly black pants and glasses. Mr. Robinson issued a gang challenge to Mr. Williams. Mr. Robinson put his hand on his waistband. Mr. Williams saw what looked like a gun handle. Mr. Williams felt

6

threatened. He thought he was going to be shot. Mr. Williams retreated into his house. Mr. Robinson called Mr. Williams a "scary ass nigger." The encounter lasted less than one minute. When Mr. Robinson issued the gang challenge, Mr. Patton was standing on the sidewalk watching what was going on. Mr. Williams testified, however, Mr. Patton appeared to know what Mr. Robinson was going to do.

As noted, Mr. Williams was entering his home to escape defendants. As this was occurring, two friends, Mr. Ross and Mr. Abner, arrived to visit Mr. Williams. Mr. Ross was driving a red Mustang. Mr. Abner was in the passenger seat. As they approached Mr. Williams's house, Mr. Ross saw two males in all dark clothing. Mr. Robinson was wearing a dark "hoodie-type" sweatshirt. Mr. Robinson had two-toned baseball gloves on his hands. Mr. Robinson looked directly at Mr. Ross and displayed the local gang's sign. Mr. Patton was standing about four feet away from Mr. Robinson. Mr. Ross testified, "I could tell they [were] together . . . ." Mr. Williams telephoned Mr. Ross. Mr. Williams wanted to warn Mr. Ross of defendants' presence, but the warning came too late. Mr. Williams testified: "I tell [Mr. Ross] to get back in the car. These two dudes that's walking up, they like tripping. They got a gun or whatever, and I don't want nothing to happen to you so to get back in the car."

Mr. Ross and Mr. Abner encountered defendants as they exited Mr. Ross's car. Mr. Robinson referenced the local gang and displayed that gang's hand sign. Mr. Abner responded that his family was from the local gang. Mr. Robinson then referred to his rival African-American gang. Mr. Robinson said: "Oh Yeah? Psyche." Mr. Robinson then uttered the African-American gang name. Mr. Robinson reached into his waistband, pulled out a gun and began shooting. Mr. Robinson shot Mr. Abner four times. Mr. Abner yelled for Mr. Ross to, "Go get help." Mr. Ross backed up several steps and then ran in a zigzag fashion. He could hear defendants running behind him. Mr. Ross heard gunshots as he ran. He assumed the person that was shooting was behind him. When the shots stopped, Mr. Ross looked back. Defendants were behind him, across the street, running in the same direction as Mr. Ross. They were four or five feet away from each other. Mr. Ross testified, "They were . . . yelling out stuff." They were saying

something like, "[Y]eah, we did that." Mr. Ross was not sure whether he heard one voice or two. Mr. Ross later discovered a bullet hole in the crotch area of his pants.

At trial, Mr. Ross was shown a photograph of a pair of gloves. The photograph was taken from Mr. Patton's cellular telephone. Mr. Ross testified the gloves in the photograph were similar to the gloves Mr. Robinson was wearing at the time of the shooting.

Mr. Williams saw Mr. Robinson shooting. Mr. Williams described Mr. Patton as "observing" what was occurring. Mr. Williams saw Mr. Abner fall. Mr. Williams saw Mr. Ross running. Mr. Ross was running towards Mr. Williams. Mr. Ross was in the middle of the street running in a zigzag fashion. Mr. Williams testified, "I seen [Mr. Robinson] still continuing to fire at [Mr. Ross], [until Mr. Robinson] ran out of bullets, I guess . . . ." Both defendants then fled. Mr. Williams had a clear view of the entire scene.

Mr. Abner also saw Mr. Robinson make the hand sign for the local gang. Mr. Patton was looking in the opposite direction at the time. Mr. Robinson was wearing: a black hoodie sweatshirt; an undershirt; a black beanie; black and white gloves; and long pants. His undershirt hung down below his sweatshirt. Mr. Robinson had gang tattoos on his face. Mr. Patton was wearing glasses, a black shirt and a black hoodie.

Mr. Robinson walked up to Mr. Abner. Mr. Robinson then said the name of the local gang. Mr. Abner responded he had family members who were part of the local gang. Mr. Robinson repeated the gang name. Mr. Abner "fanned [Mr. Robinson] off" and reached to open the Mustang's passenger door. Mr. Abner testified he was not afraid when defendants approached. Mr. Abner assumed defendants were from the local gang, as were members of Mr. Abner's family. Mr. Abner did not think there would be any trouble.[2]

---

[2] Mr. Abner testified: "Q . . . what were you thinking at that moment? [¶] A I wasn't scared. Because once again, the guy threw up [the local gang] at me, and I'm very familiar with that area. . . . That's where I grew up. The gang sign is not, you know, nothing unfamiliar to me. So I felt like if he had a problem or altercation with me, it

Mr. Robinson blocked Mr. Abner's path. Mr. Robinson announced his gang affiliation. Mr. Robinson stepped back until he was five to six feet away from Mr. Abner. Mr. Robinson pulled out a gun and twice shot Mr. Abner in the left thigh. Mr. Abner fell into the front passenger seat of the Mustang. Mr. Robinson shot Mr. Abner in the knee. Mr. Abner told Mr. Ross: "'Run. Like, go. Go. I'm shot. Go. Get help.'" Mr. Ross got out of the car and ran across the street. Mr. Robinson then shot at Mr. Ross. Mr. Abner described what happened next: "[Mr. Robinson's] shooting at [Mr. Ross], and he walks around the car. He's in the back of the car now. And he shoots again at [Mr. Ross]. [Mr. Ross] is on the other side of a van. So then [Mr. Robinson] walks across the street, and he's looking under the car. He's looking for [Mr. Ross]. [¶] So I'm watching as I am crawling over the passenger seat. And [Mr. Robinson] – as I get to the driver's side, I look to the left. I see [Mr. Robinson] shooting at [Mr. Ross]. [Mr. Robinson] sees me. He shoots me again in my hip." Defendants ran away together towards Normandie Avenue. Mr. Robinson took off running first and Mr. Patton followed. As they ran, they yelled out their gang name.

Karen Patton was in her house when she heard gunshots. She briefly looked out a window. She saw an African-American male in a white T-shirt running west towards Denker Avenue. Ms. Patton called an emergency operator.

---

wasn't going to be a problem for me to discuss it. [¶] So when he walked up to me and said '[the local gang's name],' I said, 'What's up? [Local gang name], bro. My people from this area.' [Meaning, I am not a local gang member but I have family members from this neighborhood.] And he said, 'Yeah?' [¶] . . . [¶] . . . [W]hen he threw up that gang sign at me, I kind of, I felt like, why you throwing up a gang sign at me? You know, if you're from this area, then you would see my face before and you would know me, just because I grew up in this area. You know, everyone knows each other and knows everybody. [¶] . . . [¶] [Then,] [h]e repeats hisself. He repeats hisself. He says, [local gang name] again. I said, 'man,' and I fanned him off. And I go to open the passenger door. [¶] . . . [¶] . . . And he said, 'Psych, [rival gang name].' And he pulled out the gun, and that's when he started shooting."

9

## 2. The investigation

### a. defendants are detained

Detective Raul Magadan and Deputy John Herman were in an unmarked sheriff's car in the area. They heard approximately seven gunshots. A police radio broadcast issued concerning the shooting stated two African-American males had been seen running from the scene. While driving west on 111th Street, Detective Magadan saw defendants running north on Raymond Avenue toward 111th Street. They were running away from the area where the shooting occurred. They were only a few blocks from the location of the shooting. Detective Magadan and Deputy Herman detained defendants and searched them. No weapon was found. However, both defendants tested positive for gunshot residue. The positive results meant either defendant could have fired a weapon, come into contact with a surface that had gunshot residue on it, or been near a firearm when it was discharged.

Detective Magadan testified Mr. Robinson said, "'Some [rival gang members] are shooting at me, and that's why I'm running.'" When detained, Mr. Patton was wearing glasses and a white T-shirt or tank top. Mr. Patton was not wearing nor was he in possession of any gloves or a hooded sweatshirt. Mr. Robinson was dressed in a white shirt and blue jeans. Mr. Robinson did not have any gloves or a beanie in his possession. He had two tattoos on his arm. Deputy Ericka Gooseberry drove Mr. Ross and Mr. Williams to a field show-up. When Deputy Gooseberry observed defendants, they were both wearing white T-shirts and dark pants. Deputy Gooseberry did not see any black hoodies, black beanies, or gloves.

### b. the identifications

#### i. field showups

Mr. Ross identified defendants during a field show-up several blocks away from the shooting scene. Mr. Ross was "a hundred percent" certain Mr. Robinson was the assailant. Mr. Ross identified Mr. Patton as "the other one." At trial, Mr. Ross said he was less certain about his identification of Mr. Patton as one of the assailants. Deputy Gooseberry testified Mr. Ross was adamant and confident in his identifications. She testified, "[He] answered with confidence, and there was no hesitation."

Mr. Williams also identified Mr. Robinson as the gunman during a field show-up. Mr. Williams saw Mr. Robinson during the field show-ups. Mr. Robinson said, "[T]hat's the guy." Mr. Williams further testified, "I was a hundred percent sure that that was him." Mr. Williams also identified Mr. Patton at the field show-up. Deputy Gooseberry transported Mr. Williams to the field show-up. Deputy Gooseberry testified that Mr. Williams identified Mr. Robinson: "[Mr. Williams] was very adamant. He was confident that that was the person involved in the incident. And he identified him right away without any hesitation." Deputy Gooseberry confirmed that Mr. Williams also identified Mr. Patton as the person who was with the person who fired the gun.

#### ii. photographic lineups

On March 10, 2011, Mr. Ross viewed a photographic lineup. Mr. Patton's photograph was in position number six. Mr. Ross told Detective White number three or number six "looked similar to [one of the assailants]" or "could be him." Mr. Ross testified he was unsure when making the identifications of numbers three and six. When cross-examined, Mr. Ross said he was unable to identify anyone; he was unsure. Mr. Ross looked at a second photographic lineup. It contained Mr. Robinson's

photograph in position number two.  Mr. Ross identified number two as the person who fired the shots right away.  Mr. Ross wrote, "90 [percent] sure it could be the shooter."

Also on March 10, 2011, Mr. Williams viewed two photographic lineups.  The first lineup included Mr. Patton's photograph in position number six.  Mr. Williams was unable to identify anyone in the first lineup.  The second lineup included a photograph of Mr. Robinson in position number two.  Mr. Williams immediately identified Mr. Robinson as the person who fired the shots.  Mr. Williams wrote, "'That's the shooter.'"

On March 10, 2011, Mr. Abner viewed two photographic lineups.  The first lineup included Mr. Robinson's photograph in position number two.  Upon viewing that lineup, Mr. Abner circled photographs number one and three.  Mr. Abner said he was 20 percent certain as to photograph number one.  And he said he was 80 percent certain as to photograph number three.  Mr. Patton's photograph was in position number six in the second lineup.  Mr. Abner was unable to identify any of the six individuals pictured.  Detective White testified, "[Mr. Abner] told me that he wished he could see them in person in a live lineup; it would help him out better."

### iii.  preliminary hearing and trial identifications

At trial, Mr. Ross identified defendants as the two men he saw during the field showup.  Mr. Ross identified Mr. Robinson as the gunman.  Mr. Ross testified, "I'm a hundred percent sure."  Mr. Ross remembered the tattoos on Mr. Robinson's face.  Mr. Ross testified, "I just don't forget faces."  Mr. Ross did not identify Mr. Patton at the preliminary hearing or at trial as having been with Mr. Robinson at the time of the shooting.

At the June 28, 2011 preliminary hearing, Mr. Williams identified both defendants.  At trial, Mr. Williams once again identified defendants as the perpetrators of the crimes.  Mr. Abner did not testify at the preliminary hearing.  At trial, Mr. Abner

12

identified Mr. Robinson.  Mr. Abner was "very positive" that Mr. Robinson was the man who fired the shots.

### c.  the weapons

Detective White testified firearms are very valuable to gang members.  Firearms are kept in various places known to the gang members.  Firearms are passed among gang members for protection and for use to commit crimes.

An expended bullet, bullet casings and bullet fragments were found in and around Mr. Ross's red Mustang.  There were three bullet holes in the front passenger door of Mr. Ross's vehicle.  Three bullets perforated the door from outside the Mustang and continued into the interior compartment.  A bullet jacket fragment rested just inside the door's compartment.  Another bullet perforated the center console just to the right of the hand brake.  A projectile came to rest right near the hand brake.  Another bullet travelled from outside the right side of the car to the left side; it exited the left rear quarter panel, just below the left rear fixed window.  Some of the bullet fragments found at the scene of the March 7, 2011 shooting were fired from either a .357 Magnum, a .38 Special, a .357 Sig or a .9 millimeter handgun.  A cartridge case from a .32 caliber automatic was also found.

On April 4, 2011, a .357 caliber Smith & Wesson revolver was taken from defendants' fellow gang member, Walter Jones.  On April 20, 2011, Mr. Patton and Mr. Jones both made appearances in the Inglewood courthouse.  During a telephone conversation between Mr. Patton and his mother, while he was in a lockup in the Inglewood courthouse, she said:  "They don't have nothing on you.  Uh, the D.A. and the first attorney was talking and both attorneys said they don't have nothing on - they have - I guess they have a weapon, but nobody's - they didn't find any prints on it."  Mr. Patton responded: "Oh.  Thank you, Momma.  Momma, guess what?  . . .  [¶]  I mean, yeah, I mean, you know - remember I told you somebody had,  ah, went to jail with, ah, one of them things?  That you . . . remember you went over there looking for that bracelet?  On

13

110th?" Immediately thereafter in the conversation, Mr. Patton continued: "And I told you the boy, he, ah, lost it? . . . [¶] . . . Yeah, well, he in here."

Later in the recorded telephone conversation, a person identified only as Toya spoke and reiterated to Mr. Patton the authorities did not have any evidence. The person identified only as Toya then said to Mr. Patton: "Even if they found the .357 ain't no fingerprints on it. So can't tie nothing to you . . . ." After complaining about Mr. Patton's lawyer's tardiness, the person identified only as Toya said: "It's stupid as fuck, but from my eyes, it look pretty good." Mr. Patton responded: "That's good. That's good."

In a subsequent telephone conversation, one hour later, Mr. Patton and his mother again discussed the whereabouts of the "bracelet." They also discussed who had possession of Mr. Patton's "stuff," his "mail," and his "jacket." She said: "Now, can you tell me about - about my bracelet? Where is it?" Mr. Patton responded by referring to "[t]he guy" but the conversation was interrupted by a bad connection. When Mr. Patton and his mother were able to resume their conversation, he said: "The guy - [y]eah. . . . I think they gonna try to put his case with ours. [¶] . . . 'Cause he was the one they got caught with it." Mr. Patton's mother asked where he had gotten this information and he responded: "No, just now. [¶] . . . He's in the holding tank." Mr. Patton stated that the person in the holding tank with him was about ready to walk into the courtroom. Mr. Patton's mother attempted to figure out who was the individual about ready to walk into the courtroom. Mr. Patton responded: "The guy - that guy got caught with - with, uh - that thing. [¶] . . . Remember I told you that they - somebody got caught with it?" Thereafter, the conversation shifted to where a "jacket" could be located.

Detective White testified he believed the participants to the conversation were talking in code about a firearm. Detective White believed the "bracelet" was code for the firearm used in the shooting. The trial court instructed the jury Detective White did not know for sure that "bracelet" meant firearm; the evidence was offered to explain why Detective White took certain actions. Detective White explained: "By listening to the whole content of the conversation, having talked about the .357 earlier in the

14

conversation, having known that Walter Jones was at court at the exact same day, I formed the opinion that they were talking about the firearm."

On June 24, 2011, another of defendants' fellow gang members, Felton Love, was detained in possession of a loaded .32 caliber semiautomatic Echasa-Eibar firearm. The bullet casing recovered from the March 7, 2011 shooting had been fired from that weapon.

### 3. Mr. Robinson's in-custody conversations

On March 17, 2011, Sherice Brooks visited Mr. Robinson in jail. The jury listened to the recorded conversation. Ms. Brooks and Mr. Robinson discussed the victims of the March 7, 2011 shooting. Mr. Robinson referred to the victims as "[t]he dark" and "[t]he light-skinned" ones. Ms. Brooks said one of the victims was her cousin "Hakeem." Mr. Robinson urged Ms. Brooks to talk to her cousin. Mr. Robinson instructed Ms. Brooks, "All you gotta do is tell him show up to say I wasn't there." A second visit between Ms. Brooks and Mr. Robinson, who was in custody, occurred on March 19, 2011. Ms. Brooks and Mr. Robinson discussed the whereabouts of his clothes and "shit." Mr. Robinson instructed Ms. Brooks to tell Mr. Love to burn the items. During a third visit, on March 20, 2011, Mr. Robinson again asked Ms. Brooks about his clothes and "the thing." Ms. Brooks said "they" told her "they" put his things in the trash.

Detective White had listened to the recorded conversations between Mr. Robinson and Ms. Brooks. After listening to the March 17, 2011 conversation, Detective White became concerned for Mr. Ross's safety. Detective White formed an opinion concerning the March 19, 2011 conversation between Mr. Robinson and Ms. Brooks. Detective White believed defendant was directing Ms. Brooks and Mr. Love to get the clothing and the firearm related to the incident and burn them.

15

### 4.  For the benefit of a criminal street gang

Detective White testified based on a hypothetical scenario tracking the facts of the attempted murders of Mr. Abner and Mr. Ross.  Detective White believed the hypothetical crime was committed for the benefit of a criminal street gang.  Detective White relied in part on the fact the assailants went very deep into rival gang territory and committed the crimes in broad daylight.  Detective White testified:  "This appears to be like a mission.  Basically gang members go on missions together.  Sometimes two or more individuals from the gang will stick together, and they have different roles.  It could be as simple as a person is a lookout, a person is to provide back-up to show power in numbers.  The individual is also possibly armed to protect him.  And also to witness the crime.  A lot of times, gang members want to go back to the gang to say, 'Yes, we just did this, and I saw it myself.'"

## III.  DISCUSSION

### A.  Joinder

Defendants each purport to join in the other's arguments on appeal.  (Cal. Rules of Court, rule 8.200(a)(5).)  Joinder in appellate arguments is broadly permitted.  (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)  However, as to the joined arguments, a joining defendant must individually meet his or her burden to demonstrate error and prejudice.  (*People v. Nero, supra,* 181 Cal.App.4th at p. 510, fn. 11.)  A defendant cannot rely solely on a co-defendant's arguments and reasoning to satisfy his or her own burden on appeal.  (*Ibid.*)  To the extent defendants have not satisfied their burden on appeal, we consider a given issue only as to the defendant who raised it.  (*Ibid.*)

## B. The Trial Court Did Not Abuse Its Discretion
## In Denying Defendants' Severance Motions

### 1. Standard of Review

Defendants contend the trial court abused its discretion in refusing to sever count 1, charging Mr. Patton with Mr. Perla's murder, from counts 2 and 3. Counts 2 and 3 allege defendants attempted to murder Mr. Ross and Mr. Abner. Our review is for an abuse of discretion. (*People v. Jones* (2013) 57 Cal.4th 899, 925; *People v. Vines* (2011) 51 Cal.4th 830, 855.) Our Supreme Court has held, "Separate trials are permitted in the discretion of the trial court . . . and whether a trial court's denial of a severance motion constitutes an abuse of discretion is judged on the facts as they appeared at the time the court ruled on the motion. (*People v. Boyde* [(1988) 46 Cal.3d 212,] 232; *People v. Turner* (1984) 37 Cal.3d 302, 312[, disapproved on another point in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149-1150].)" (*People v. Hardy* (1992) 2 Cal.4th 86, 167; accord, *People v. Souza* (2012) 54 Cal.4th 90, 109.) "On appeal following trial, however, [even if the trial court's ruling was proper when made,] there remains the question whether, despite the correctness of the trial court's ruling, a gross unfairness has occurred from the joinder such as to deprive the defendant of a fair trial or due process of law. (See *People v. Turner, supra,* 37 Cal.3d [at p.] 313; *People v. Bean* (1988) 46 Cal.3d 919.)" (*People v. Johnson* (1988) 47 Cal.3d 576, 590; accord, *People v. Souza, supra,* 54 Cal.4th at p. 109.) We find no abuse of discretion and no due process violation.

### 2. Statutory Requirements

Pursuant to section 954, "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set

forth in the accusatory pleading be tried separately . . . ." All of the counts charged in the present case involved the murder or attempted murder of individuals perceived to be rival gang members. Thus all of the counts charged the same class of crimes. (*People v. Jones, supra,* 57 Cal.4th at p. 924; *People v. Soper* (2009) 45 Cal.4th 759, 771; *People v. Jenkins* (2000) 22 Cal.4th 900, 947.)

In addition to section 954, we must also consider the section 1098 requirement that multiple defendants may not be tried together unless they are jointly charged with a crime. (*People v. Ortiz* (1978) 22 Cal.3d 38, 44-45; accord, *People v. Magana* (1979) 95 Cal.App.3d 453, 468.) Section 1098 provides, "When two or more defendants are jointly charged with any public offense . . . they must be tried jointly, unless the court order[s] separate trials." Section 1098 states a Legislative preference for joint trials. (*People v. Gamache* (2010) 48 Cal.4th 347, 381; *People v. Boyde, supra,* 46 Cal.3d at pp. 231-232.) As our Supreme Court has explained, a joint trial is permissible under sections 954 and 1098 when all of the defendants are jointly charged in at least one count. (*People v. Ortiz, supra,* 22 Cal.3d at p. 45; *People v. Pike* (1962) 58 Cal.2d 70, 84-85.) That requirement was met here. Defendants were jointly charged in counts 2 and 3.

### 3. Prejudice

#### a. overview

Because the statutory requirements for joinder of the charges were met, defendants could establish a joint trial would be an abuse of discretion only by making a clear showing of prejudice. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220; *People v. Mendoza* (2000) 24 Cal.4th 130, 160.) Refusal to sever may be an abuse of discretion where certain factors prevail. (*Alcala v. Superior Court, supra,* 43 Cal.4th at pp. 1220-1221; *People v. Memro* (1995) 11 Cal.4th 786, 849-850.) As our Supreme Court has explained: "'The factors to be considered are these: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually

inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case.' [Citations.]" (*Alcala v. Superior Court, supra,* 43 Cal.4th at pp. 1220-1221; accord, *People v. Jones, supra,* 57 Cal.4th at p. 925; *People v. Memro, supra,* 11 Cal.4th at pp. 849-850.)

### b. cross-admissibility

Cross-admissibility of evidence is sufficient standing alone to justify a trial court's refusal to sever charges. (*Alcala v. Superior Court, supra,* 43 Cal.4th at p. 1221; *People v. Carter* (2005) 36 Cal.4th 1114, 1154.) Moreover, complete or two-way cross-admissibility is not required. (*Alcala v. Superior Court, supra,* 43 Cal.4th at p. 1221; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1129, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The evidence substantiating the gang allegations would be admissible in separate trials. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050; *Calderon v. Superior Court* (2001) 87 Cal.App.4th 933, 939-941 *People v. Funes* (1994) 23 Cal.App.4th 1506, 1516-1518.) Moreover, evidence of the manner in which Mr. Patton committed the murder would be admissible against him in a trial of the attempted murders. The murder and attempted murders were committed under very similar circumstances. In each case: a gang member or members entered rival gang territory on foot; the gang member or members challenged individuals perceived to be rival gang members; and then the person with the gun shot or attempted to shoot the victims multiple times. Evidence of the manner in which Mr. Patton committed the murder tended to prove he harbored the intent to aid and abet in the attempted murders. (Evid. Code, §§ 352, 1101, subd. (b).) (*People v. Garcia* (2008) 168 Cal.App.4th 261, 277-278; see *People v. Rogers* (2013) 57 Cal.4th 296, 325-326; *Alcala v. Superior Court, supra,* 43 Cal.4th at pp. 1222-1223.) As noted above, this cross-admissibility alone suffices to establish the trial court did not abuse its discretion in

refusing to sever count 1 from counts 2 and 3.  (*Alcala v. Superior Court, supra,* 43 Cal.4th at p. 1221; *People v. Carter, supra,* 36 Cal.4th at p. 1154.)

### c.  inflammatory nature of the charges

As noted above, refusal to sever may also be an abuse of discretion where certain of the charges are unusually likely to inflame the jury against the defendant.  (*Alcala v. Superior Court, supra,* 43 Cal.4th at pp. 1220-1221; *People v. Memro, supra,* 11 Cal.4th at pp. 849-850.)  Defendants argue evidence of the manner in which Mr. Perla was murdered was likely to inflame the jury against both of them.  We disagree.  Mr. Perla's murder was not particularly inflammatory as compared to the attempted murders of Mr. Abner and Mr. Ross.  Mr. Patton shot Mr. Perla in the head.  This caused Mr. Perla to fall to the ground.  Mr. Patton continued to shoot at Mr. Perla who was prone on the ground.  Mr. Robinson shot Mr. Abner multiple times.  After being initially hit, Mr. Abner fell into a car, an enclosed place.  Mr. Robinson chased Mr. Ross.  During the chase, Mr. Robinson fired at Mr. Ross multiple times.  All of the crimes were gang-motivated.  All of the shootings were unprovoked.  In each case, the jury reasonably concluded the shooter intended to kill.  That Mr. Robinson failed to hit either victim in the head or upper torso did not make the manner in which the attempted murders occurred less inflammatory than the murder.

### d.  weak versus strong case

Further, refusal to sever may be an abuse of discretion when a weak case is joined with a strong case.  In such a situation, the "spillover" effect of aggregate evidence on several charges might alter the outcome of some or all of the charges.  (*Alcala v. Superior Court, supra,* 43 Cal.4th at pp. 1220-1221; *People v. Memro, supra,* 11 Cal.4th at pp. 849-850.)  Mr. Patton argues that, as compared to the murder case against him, the attempted murders prosecution was weak with respect both to identification and

20

culpability. Therefore, Mr. Patton argues, trying count 1 with counts 2 and 3 allowed the prosecution to bolster a weak case with a stronger case. We disagree that this assessment permits reversal.

The case against Mr. Patton for Mr. Perla's murder was not significantly stronger than that for the attempted murders in terms of identification and culpability. It is true that the evidence identifying Mr. Patton as Mr. Perla's murderer was stronger. Mr. Garcia confidently identified Mr. Patton as Mr. Perla's murderer. This identification is strengthened by the fact Mr. Garcia knew Mr. Patton. However, Mr. Garcia was the sole witness to identify Mr. Patton in the murder case. In the case of the attempted murders, multiple witnesses identified Mr. Patton as a perpetrator. Mr. Ross and Mr. Williams both identified Mr. Patton at the field showup. Mr. Ross also identified Mr. Patton in a photographic lineup as looking similar to the companion of the person who fired the shots. Mr. Williams identified Mr. Patton at the preliminary hearing and again at trial. Further, with respect to the attempted murders, Mr. Patton and Mr. Robinson were fellow gang members. The jury found Mr. Patton had committed a gang murder just one month prior to the attempted murders of Mr. Ross and Mr. Abner.

Further, witnesses to the attempted murders testified: defendants stood next to one another while Mr. Robinson flashed gang signs and issued gang challenges; defendants were together when Mr. Robinson opened fire on the victims; Mr. Patton fled side by side with Mr. Robinson after the shootings; both men shed their outer clothing; and Mr. Patton was still in Mr. Robinson's company when they were detained by police officers. Further, Mr. Patton implicated himself during in-custody telephone conversations. Mr. Patton and his mother discussed the weapon, a .357 caliber firearm, used in the attempted murders. Mr. Patton spoke with a person only identified as Toya, who described the weapon used in the attempted murders as a .357. When Mr. Patton heard no fingerprints were found on the gun, he responded: "That's good. That's good." Mr. Patton also said someone had "picked up all the stuff" that day. Mr. Patton wanted to know what had happened to his things. Given the evidence, the trial court could reasonably conclude counts 2 and 3 did not present a weak case as compared to count 1.

21

e. confusion

Mr. Robinson argues inevitable evidentiary confusion caused the two shootings to blend together. There is no substantial likelihood the jury was confused. The crimes occurred at different times and in different locations. The crimes were perpetrated upon and witnessed by different individuals. The evidence as to each clearly related only to either count 1 or counts 2 and 3. The jury was instructed to separately consider the evidence as to each defendant and each charge. The jury was instructed: "You must separately consider the evidence as it applies to each defendant. You must decide each charge for each defendant separately." (CALCRIM No. 203.) We presume the jurors obeyed the trial court's instructions. (*People v. Montes* (2014) 58 Cal.4th 809, 888; *People v. Yeoman* (2003) 31 Cal.4th 93, 138-139.)

5. conclusion

The trial court did not abuse its discretion in declining to sever count 1 from counts 2 and 3. Further, the denial of defendants' severance request did not cause the trial to be fundamentally unfair. (See *People v. Cook* (2006) 39 Cal.4th 566, 581-583; *People v. Jenkins, supra,* 22 Cal.4th at pp. 947-949.)

B. Substantial Evidence Supported The Jury's Finding
Mr. Patton Aided And Abetted The Attempted Murders

Mr. Patton asserts there was insufficient evidence he aided and abetted in the attempted murders as charged in counts 2 and 3. Mr. Patton relies in large part on Mr. Abner's testimony on cross examination by Mr. Patton's trial attorney, Ronald J. Higgins. Mr. Abner testified that: as Mr. Robinson began shooting, Mr. Patton stepped back and stood there watching; it appeared as if Mr. Robinson was the leader of the entire event; Mr. Robinson made a gang reference; when the gang reference was made,

22

Mr. Patton was standing behind Mr. Robinson looking the other way; Mr. Patton did not have a weapon; and Mr. Patton never touched his waist area as if he were trying to conceal or hold anything. And Mr. Abner did not believe Mr. Patton was encouraging Mr. Robinson. In connection with Mr. Robinson, Mr. Abner testified, "I didn't see him do anything." And as far as Mr. Abner could see, Mr. Patton did not give any type of assistance to Mr. Robinson.

The prosecution did not rely on a natural and probable consequences theory. In these circumstances, as our Supreme Court has explained: "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (E.g., 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 53, pp. 262-263; see, e.g., *People v. Swain* (1996) 12 Cal.4th 593, 604-605.) To be guilty of a crime as an aider and abettor, a person must 'aid[] the [direct] perpetrator by acts or encourage[] him [or her] by words or gestures.' (*People v. Villa* (1957) 156 Cal.App.2d 128,134; accord, *People v. Gonzales* (1970) 4 Cal.App.3d 593, 600; see generally 1 Witkin & Epstein, Cal. Criminal Law, *supra,* Introduction to Crimes, § 78, p. 124.) In addition, except under the natural-and-probable-consequences doctrine (see, e.g., *People v. McCoy* (2001) 25 Cal.4th 1111, 1118; see generally *People v. Prettyman* (1996) 14 Cal.4th 248, 260-263), which is not implicated on the facts presented here, the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose of either committing, or of encouraging or facilitating the commission of,' the crime in question. (*People v. Beeman* (1984) 35 Cal.3d 547, 560; accord, e.g., *People v. Prettyman, supra,* 14 Cal.4th at p. 259; *People v. Croy* (1985) 41 Cal.3d 1, 11-12.) When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' (*People v. Beeman, supra,* 35 Cal.3d at p. 560.) Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or

23

encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill. (See *People v. McCoy, supra,* 25 Cal.4th at p. 1118.)" (*People v. Lee* (2003) 31 Cal.4th 613, 623-624.)

We apply the substantial evidence standard of review. Our Supreme Court set forth that standard of review in *People v. Manibusan* (2013) 58 Cal.4th 40, 87: "'[W]e review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] ". . . We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict. [Citation.]' (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 . . . .)"

Mr. Patton's mere presence at the scene and his failure to prevent the shootings are insufficient to establish he aided and abetted the attempted murders. (*People v. Salgado* (2001) 88 Cal.App.4th 5, 15 [mere presence insufficient]; *People v. Culuko* (2000) 78 Cal.App.4th 307, 331 [mere failure to prevent]; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409, citing *People v. Durham* (1969) 70 Cal.2d 171, 181.) However, presence at the crime scene, companionship, and conduct before or after the offense are factors that may be considered in determining aiding and abetting liability. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5; *People v. Campbell, supra,* 25 Cal.App.4th at p. 409; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094-1095.) Here, Mr. Patton engaged in a pattern of gang-motivated assaults. Less than two months prior to the attempted murders,

24

Mr. Patton and an unidentified companion went on foot into rival gang territory. There, Mr. Patton and the unidentified man confronted individuals perceived to be rival gang members. Mr. Patton issued gang challenges first to Mr. Garcia and then to Mr. Perla, a rival gang member. Mr. Patton fatally shot Mr. Perla multiple times. On March 7, 2011, Mr. Patton and Mr. Robinson, fellow gang members, armed themselves and went on foot into rival gang territory. Mr. Robinson issued gang challenges to individuals perceived to be rival gang members. Mr. Patton was standing next to Mr. Robinson when the gang challenges were made. Mr. Robinson issued a gang challenge to Mr. Williams. Mr. Robinson then turned toward Mr. Ross and Mr. Abner. Mr. Robinson engaged in a ruse designed to cause his victims to acknowledge their membership in a rival gang. Mr. Robinson shot two victims perceived to be rival gang members. The crimes were committed in a similar manner and with a common gang motive. Thus, Mr. Patton's participation in Mr. Perla's murder was probative of his intent to aid and abet in committing the attempted murders. (*People v. Garcia, supra,* 168 Cal.App.4th at pp. 277-278; see *People v. Rogers, supra,* 57 Cal.4th at pp. 325-326; *Alcala v. Superior Court, supra,* 43 Cal.4th at pp. 1222-1223.)

Moreover, defendants were fellow gang members who acted in concert both before and after the shooting. As noted above, they armed themselves and went on foot into rival gang territory. They approached Mr. Williams side by side. Both appeared to be angry. Mr. Patton stood nearby while Mr. Robinson challenged Mr. Williams. Mr. Williams testified Mr. Patton appeared to know what Mr. Robinson was going to do. Mr. Patton stood only four feet from Mr. Robinson. Mr. Robinson then looked directly at Mr. Ross and displayed a gang sign. Mr. Patton would have known that the gang sign Mr. Robinson was making was that of the rival gang. Mr. Ross testified Mr. Robinson and Mr. Patton were together. Defendants subsequently approached Mr. Abner and Mr. Ross together. Mr. Patton remained in close proximity to Mr. Robinson. As they remained near one another, Mr. Robinson repeatedly made gang references and then shot the victims. Mr. Patton made no attempt to intervene or to leave. There was no evidence Mr. Patton was surprised by Mr. Robinson's actions. In fact, Mr. Patton chased Mr. Ross

25

alongside Mr. Robinson. Mr. Ross could hear the two men running behind him. Mr. Patton and Mr. Robinson also fled the shooting scene together. As they ran away, one or both of the defendants yelled out their gang affiliation. Mr. Patton and Mr. Robinson were still together when, shortly afterwards, they were detained by the police. Both men had shed their outer clothing. They were running in a direction away from the location of the shooting, toward their own gang territory.

There was evidence two guns were used. Bullet casings and fragments from two different firearms were found at the scene. And both victims tested positive for gunshot residue. Guns that could have been used in the attempted murders were later recovered from two of defendants' fellow gang members. Although the victims did not see Mr. Patton with a gun, the jury could reasonably infer Mr. Patton was armed and fired a weapon at the victims.

Further, Detective White testified that murder and attempted murder were among defendants' gang's primary activities. Detective White testified hypothetical individuals acting as had Mr. Patton and Mr. Robinson were on a mission to assault a rival gang member in rival gang territory. Detective White testified: "This [hypothetical scenario] appears to be like a mission. Basically gang members go on missions together. Sometimes two or more individuals from the gang will stick together, and they have different roles. It could be as simple as a person is a lookout, a person is to provide back-up to show power in numbers. The individual is also possibly armed to protect him. And also to witness the crime. A lot of times, gang members want to go back to the gang to say, 'Yes, we just did this, and I saw it myself.'" Based on Detective White's opinion, the jury could reasonably conclude Mr. Patton acted as a backup, lookout and witness to the crimes.

Finally, Mr. Abner's testimony that Mr. Patton did not do anything to aid Mr. Robinson was not a legal conclusion. The properly instructed jury was not obligated to adopt Mr. Abner's perspective. The foregoing was substantial evidence Mr. Patton by his acts aided and encouraged the crimes. (See *In re Juan G., supra,* 112 Cal.App.4th at pp. 5-6; *People v. Hoang* (2006) 145 Cal.App.4th 264, 274-276; *People v. Hodgson*

26

(2003) 111 Cal.App.4th 566, 576-577; *People v. Campbell, supra,* 25 Cal.App.4th at pp. 408-410; *In re Lynette G., supra,* 54 Cal.App.3d at pp. 1094-1095.)

## C.  Mr. Patton's Mistrial Motion

Prior to trial, the trial court ruled evidence of statements by a codefendant must be edited to avoid incriminating the other defendant.  In his opening statement, Mr. Robinson's counsel, Bruce L. Karey, asserted in part:  "The evidence is also going to show that approximately, I'd say a block and a half away, Mr. Robinson and Mr. Patton have contact with sheriff deputies.  I expect that the evidence will show you that the minute that they have contact with the deputies, Mr. Robinson says, 'Hey, these [gang members] in a red car shot at us.'"

At the conclusion of Mr. Karey's argument, Mr. Patton's trial attorney, Mr. Higgins, made an oral mistrial motion.  Mr. Higgins argued:  "I move for a mistrial as to my client.  [¶]  Counsel unintentionally said that his client said that what we had agreed is not going to come in.  He said, 'They shot at us.'  And all of that was excised from the transcript of [Mr. Robinson.]  [¶]  We have a joint trial.  And I don't see how it can be undone at this point."  Mr. Karey apologized for his inadvertent violation of the trial court's ruling.  Following argument by all counsel, the trial court denied the motion. The trial court ruled:  "The motion for mistrial is respectfully denied.  [¶]  I intend to instruct the jury that the opening statements of counsel [are] not evidence.  That the evidence comes from the witness stand, and the exhibits that they receive.  [¶]  And they will be further instructed at the end of the case."  Immediately after ruling, with the jury present, the trial court instructed:  "Before the prosecution calls its first witness, ladies and gentlemen, I just wanted to remind you that the opening statements of counsel are not evidence.  The evidence comes through the testimony of witnesses, and any exhibits that are received into evidence.  [¶]  So you are not to presume that the statements of counsel are necessarily correct because they are certainly not evidence."

27

During a subsequent Evidence Code section 402 hearing, Detective Magadan testified concerning the detention of Mr. Patton and Mr. Robinson. When detained, Mr. Robinson said some gang members in a red car had been shooting at them and that was why they were running. The trial court ruled the defense would be permitted to inquire regarding the spontaneous statement. The trial court directed Detective Magadan as follows: "[W]hen you respond to the questions that are being asked as to the statement by Mr. Robinson, you're not to use the word 'us.' [¶] Mr. Higgins: Or 'we.' [¶] The Court: Or 'we.' It's going to be 'I' and/or 'him.' So that it's singular rather than plural. So it only relates to the speaker." Detective Magadan acknowledged that he understood. Later, on direct examination by Deputy District Attorney Ethan Milius, Detective Magadan testified upon being detained, Mr. Robinson said, "'Some [gang members] are shooting at me, and that's why I'm running.'"

On appeal, Mr. Patton asserts the trial court abused its discretion and violated his confrontation rights when it denied the mistrial motion. Mr. Patton relies on *Bruton v. United States* (1968) 391 U.S.123, 135-136 and *People v. Aranda* (1965) 63 Cal.2d 518, 526-527. Mr. Patton argues these decisions stand for the proposition that the admission of Mr. Robinson's incriminating statements, which were not subject to cross-examination, cannot be cured through jury instruction. Mr. Patton reasons that because the mistrial motion came early in the trial, beginning jury selection anew would have been a small price to pay to protect his constitutional rights. Mr. Patton argues Mr. Robinson's remark as related by Mr. Karey in his opening statement "clearly" inferred defendants were together at the time of the shooting. Mr. Patton argues the foregoing hearsay statement placing him at the shooting was highly incriminating. He argues it placed him at the shooting scene in a case where eyewitnesses had difficulty identifying him. Mr. Patton further asserts Detective Magadan's trial testimony referencing Mr. Robinson's statement compounded the earlier error. According to Mr. Patton, the jury would have equated Detective Magadan's testimony with Mr. Karey's earlier version of Mr. Robinson's statement.

28

Our Supreme Court has held, "A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged . . . . (*People v. Ayala* (2000) 23 Cal.4th 225, 282.)" (*People v. Bolden* (2002) 29 Cal.4th 515, 555; accord, *People v. Harris* (2013) 57 Cal.4th 804, 848.) Moreover, """"Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'"""" (*People v. Lightsey* (2012) 54 Cal.4th 668, 718; accord, *People v. Lucero* (2000) 23 Cal.4th 692, 713-714.) Our review is for an abuse of discretion. (*People v. Edwards* (2013) 57 Cal.4th 658, 703; *People v. Lightsey, supra,* 54 Cal.4th at p. 718.)

*Bruton* and *Aranda* address situations in which, "[T]he powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." (*Bruton v. United States, supra,* 391 U.S. at pp. 135-136.) That is not what happened here. Mr. Robinson's statement as related by Mr. Karey in opening argument was not "powerfully incriminating." The challenged reference to Mr. Robinson's statement was made during opening argument to the jury; it was not evidence. The jury was so instructed. The jury was further instructed to consider a defendant's pretrial statement only as to that defendant. The jury is presumed to have followed the trial court's instructions. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196-197; *People v. Coffman* (2004) 34 Cal.4th 1, 83; see *People v. Taylor* (2001) 26 Cal.4th 1155, 1173-1174.) As our Supreme Court has repeatedly stated, "Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case." (*Conservatorship of Early* (1983) 35 Cal.3d 244, 253; accord, *People v. Butler* (2009) 46 Cal.4th 847, 873; *People v. Carey* (2007) 41 Cal.4th 109, 130; *People v. Lewis* (2001) 26 Cal.4th 334, 390.)

Further, the reference to "us" in Mr. Karey's opening argument was brief and isolated. Nothing in the course of the lengthy trial drew any particular attention to the comment as incriminating Mr. Patton. Further, the undisputed evidence was that two young African-American men confronted Mr. Ross and Mr. Abner. A central issue before the jury with respect to Mr. Patton was whether he was one of those two people.

The evidence was uncontradicted that defendants were members of the same gang. There was also evidence they were friends. Mr. Patton's cellular telephone had a photograph of Mr. Robinson making their gang's hand sign. It was uncontroverted that defendants were detained by law enforcement officers in the vicinity of the shooting. It was undisputed that defendants were running side by side when the officers encountered them. It was not Mr. Robinson's statement to law enforcement officers using the word "us"—as referenced in opening argument—that was powerfully incriminating. It was defendants' relationship with each other as fellow gang members. And it was their presence together, running, in the vicinity of the shooting, that was strong circumstantial evidence of Mr. Patton's guilt. In addition, both Mr. Ross and Mr. Williams identified Mr. Patton as one of the perpetrators. And Mr. Patton implicated himself in telephone conversations he had while in custody. The *evidence* placed before the jury was that Mr. Robinson referred to himself, singularly, and not to "us." In closing argument, the deputy district attorney, Mr. Milius, quoted Mr. Robinson as saying: "Some [gang members] in a red mustang are shooting at me. That's why I am running." Mr. Karey's reference in opening argument to gang members were shooting at "us" was inconsequential in light of the evidence of Mr. Patton's guilt. Mr. Karey's misstatement was not so incurably prejudicial that a mistrial was required. Moreover, we find any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 22; *People v. Jennings* (2010) 50 Cal.4th 616, 652.)


D. Murder And Attempted Murder Instructions


Mr. Patton argues: the jury was instructed on murder and attempted murder; this confused the jury and allowed him to be convicted on an implied malice theory; the jurors were likely to have been confused as to the mental state necessary for attempted murder; and the jury should have been expressly instructed that attempted murder requires express malice. (See *People v. Visciotti* (1992) 2 Cal.4th 1, 58-59; *People v. Collie* (1981) 30 Cal.3d 43, 61-62.)

30

Mr. Patton did not specifically request a clarifying instruction in the trial court. Mr. Higgins requested instruction with a modified version of CALCRIM No. 600: "The defendants are charged in Counts 2 and 3 with **attempted murder**. [¶] To prove that a particular defendant is guilty of **attempted murder**, the People must prove that: [¶] 1 [The] defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2 [¶] [The] defendant intended to kill that person. [¶] A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt. [¶] Intent to kill unlawfully is a necessary element of attempted murder and the prosecution must prove beyond a reasonable doubt that each defendant individually harbored such an intent. Intent to kill unlawfully cannot be inferred solely from the commission of another dangerous crime such as assault with a deadly weapon. In addition to proving that a particular defendant committed an assault with a deadly weapon or shot at a victim, the prosecution must present other independent evidence which directly or by solid inference, proves beyond a reasonable doubt that the defendant intended to kill. [¶] A defendant may be guilty of attempted murder even if you conclude that murder was actually completed." Mr. Higgins argued, "Well, I'm just going to indicate that the last sentence that I included, I think that that's a correct statement of the law." The trial court denied Mr. Higgins's request for an instruction with a modified version of CALCRIM No. 600. The trial court ruled, "The pattern instructions adequately identify the factors for the jurors to consider and adequately informs them of the law." As a result, this argument was forfeited. (*People v. Young* (2005) 34 Cal.4th 1149, 1202-1203; *People v. Marks* (2003) 31 Cal.4th 197, 237.)

Attempted murder requires proof of a specific intent to kill. (*People v. Smith* (2005) 37 Cal.4th 733, 739; *People v. Croy, supra,* 41 Cal.3d at pp. 20-21.) Murder, on the other hand, does not require a specific intent to kill. (*People v. Smith, supra,* 37 Cal.4th at p. 739; *People v. Croy, supra,* 41 Cal.3d at p. 20.) As our Supreme Court explained in *Smith*: "'The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. (*People v. Lasko* (2000) 23 Cal.4th 101, 107.)' (*People v. Bland* (2002) 28 Cal.4th 313, 327 . . . .) In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' (*People v. Lee*[*, supra,*] 31 Cal.4th [at p. 623]; see *People v. Swain*[*, supra,*] 12 Cal.4th [at pp.] 604-605.)" (*People v. Smith, supra,* 37 Cal.4th at p. 739; accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 653-654.)

Here, the jury was instructed on murder pursuant to CALCRIM No. 520, "Defendant *Daishjon Patton* is charged *in Count 1* with murder in violation of Penal Code section 187." (Italics added.) The jury was further instructed that murder can be committed with express or implied malice. The instruction referred explicitly and solely to Mr. Patton and the crime charged in count 1. With respect to attempted murder, the jury was instructed pursuant to CALCRIM No. 600: "The *defendants* are charged *in Counts 2 and 3* with attempted murder." (Italics added.) Further, the jurors were instructed, "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person. [¶] AND [¶] 2. The defendant intended to kill that person." CALCRIM No. 600 correctly states the elements of attempted murder. (*People v. Ramos* (2011) 193 Cal.App.4th 43, 47; *People v. Lawrence* (2009) 177 Cal.App.4th 547, 557.) Moreover, the instruction explicitly referred to both defendants and to the charges in counts 2 and 3. The jury was further instructed to consider the evidence as to each defendant separately and to decide each charge as against each defendant separately. (CALCRIM No. 203.) It was clear, therefore, that the murder instruction as to count 1 (CALCRIM No. 520) did not apply to the attempted murder charges in counts 2 and 3.

Moreover, as instructed, the jury was required to convict on attempted murder only if it found an intent to kill. The attempted murder instruction did not imply the jury could find Mr. Patton guilty of attempted murder on an implied malice theory. (Compare, *People v. Croy, supra,* 41 Cal.3d at pp. 20-21.) Thus, the instruction error contention has no merit.

Even if there was a risk of confusion, any error is harmless beyond a reasonable doubt. In their closing arguments to the jury, each of the attorneys discussed intent to kill in relation to the attempted murder charges. Mr. Karey argued the second person—who the prosecution claimed was Mr. Patton—just stood there and did not do a thing. Further: "[Whomever] was standing next to those people, his intent was not the same as the other person's intent. If, in fact, the shooter's intent was to kill, you can't say that was the intent of the second person." Mr. Milius, the deputy district attorney, argued that based on the repeated shots fired at the victims, defendants clearly harbored a specific intent to kill Mr. Ross and Mr. Abner. Mr. Higgins argued that if the person who fired the gun intended to kill the victims, the rounds would have been fired at their upper torsos. Thus, based on the instructions and arguments, it is not reasonably probable Mr. Patton would have been acquitted if the jury were instructed differently.

Any error was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24; *People v. Lee* (1987) 43 Cal.3d 666, 676.) The case was presented to the jury on the theory Mr. Patton committed the attempted murders with an intent to kill. The jury was never told it could convict Mr. Patton of attempted murder based on a theory of implied malice. There was no defense or evidence by which the jury could have found Mr. Patton guilty of attempted murder on an implied malice analysis. In addition, the jury necessarily found pursuant to other instructions that Mr. Patton had an intent to kill. The jury found the attempted murders were willful, deliberate and premeditated. The jury was instructed a defendant "acted willfully if he intended to kill" when he acted. In order to find the attempted murders were premeditated, the jury had to find defendants had an intent to kill. If the jury based its verdict as to Mr. Patton on his personal acts, it necessarily found he intended to kill. If the jury found Mr. Robinson

33

acted with an intent to kill and Mr. Patton aided and abetted that crime, both defendants were guilty of attempted murder. (*People v. Lee, supra,* 31 Cal.4th at p. 624; *People v. McCoy, supra,* 25 Cal.4th at p. 1118; *People v. Beeman, supra,* 35 Cal.3d at p. 560.) No lawyer argued that anything other than a specific intent to kill was a requisite element of the attempted murder counts. Given the facts, instructions and arguments to the jury, any error was harmless.

## E. Consciousness Of Guilt Instructions

Mr. Patton challenges the consciousness of guilt instructions given in this case: CALCRIM No. 362 [consciousness of guilt: false statements]; CALCRIM No. 371 [consciousness of guilt: suppression and fabrication of evidence]; and CALCRIM No. 372 [flight].[3] Mr. Patton argues the instructions: allowed the jury to draw irrational

---

[3] The jury was instructed pursuant to CALCRIM No. 362: "If a defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was *aware of his guilt* of the crime and you may consider it in determining his guilt. You may not consider the statement in deciding any other defendant's guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." (Italics added.) Instruction under CALCRIM No. 371 was as follows: "If a defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was *aware of his guilt*. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. [¶] If a defendant tried to create false evidence or obtain false testimony, that conduct may show that he was *aware of his guilt*. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. [¶] If you conclude that a defendant tried to hide evidence, discouraged someone from testifying, or authorized another person to hide evidence or discourage a witness, you may consider that conduct only against that defendant. You may not consider that conduct in deciding whether any other defendant is guilty or not guilty." (Italics added.) The CALCRIM No. 372 instruction read: "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was *aware of his guilt*. If you conclude that the defendant fled or tried to flee, it is up to you to decide

34

inferences of guilt; denied his fair trial and due process rights under the United States and California Constitutions; and undermined the proof beyond a reasonable doubt requirement.

Mr. Patton did not object in the trial court to the consciousness of guilt instructions on the present grounds. Nevertheless, the arguments are properly before us. (§ 1259; *People v. Taylor* (2010) 48 Cal.4th 574, 630, fn. 13; *People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7.) No due process violation occurred. We apply the following standard of review: "[We view] the instructions as a whole, and in light of the record at trial, [to determine whether] it is . . . reasonably likely the jury understood the challenged instructions to mean defendant had the burden of establishing his [or her] innocence." (*People v. Frye* (1998) 18 Cal.4th 894, 958, disapproved on another point in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22; accord, *People v. Snow* (2003) 30 Cal.4th 43, 97.) When the consciousnesses of guilt instructions are read in light of other given jury instructions, Mr. Patton's argument is unpersuasive. CALCRIM No. 200 instructed the jury to decide the facts based only on the evidence. CALCRIM No. 200 further instructed the jury to pay careful attention to the instructions and consider them as a whole. CALCRIM No. 220 told the jury the prosecution was required to prove defendants' guilt beyond a reasonable doubt. When all of the instructions are considered collectively, there is no reasonable possibility the jury understood the challenged instructions in a way that undermined the innocence presumption. Nor considered together is there any reason to believe the challenged instructions relieved the prosecution of its burden to prove guilt beyond a reasonable doubt.

Mr. Patton acknowledges our Supreme Court has repeatedly approved consciousness of guilt instructions. (E.g., *People v. Howard* (2008) 42 Cal.4th 1000, 1020-1021 [CALJIC No. 2.52 & CALCRIM No. 372 (flight)]; 1024-1025 [CALJIC No. 2.03, CALCRIM No. 362 (false statements)]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 101-102 [CALJIC Nos. 2.04 (fabricating evidence), 2.06 (suppressing

---

the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself." (Italics added.)

evidence)].) Mr. Patton contends, however, that unlike their CALJIC counterparts, the challenged CALCRIM instructions use the phrase "aware of his guilt." Mr. Patton reasons the instructions go beyond advising jurors that false statements or suppression or fabrication of evidence or flight may be considered as indicative of guilt. Rather, the challenged instructions advise jurors that such conduct *may show the defendant was aware of his guilt*, in Mr. Patton's view. The Court of Appeal for the Fifth Appellate District rejected this claim in *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1157-1159. (See also *People v. Paysinger* (2009) 174 Cal.App.4th 26, 29-32.) Under *Rios,* the use of the term "aware of his guilt" in the CALCRIM consciousness of guilt instructions does not create an inference any different from that permitted by their CALJIC predecessors. We agree with *Rios* and reject Mr. Patton's argument.

## F. Request For Disclosure Of Juror Identifying Information

Following the guilty verdicts, Mr. Patton sought an order releasing juror contact information. (Code Civ. Proc., §§ 206, subd. (g), 237, subd. (b).) Mr. Robinson joined in the motion. In support of the motion, Mr. Higgins declared: "As the jurors entered the courtroom to deliver the verdicts and as the verdicts were being read, I observed several jurors openly weeping (jurors #5, #11 and #12) as if said verdicts were not the products of their own free wills. It appeared to the undersigned that said jurors had been placed under extreme duress to agree to said verdict despite evidence that created reasonable doubt that Daishjon Patton was the shooter of Edwin Perla on January 29, 2011 and that he was involved in the incident March 7, 2011. [¶] . . . It is my opinion, based on having practiced criminal defense since 1982 and having served as defense counsel in numerous serious felony trials, that the weeping jurors were psychologically forced to agree to the verdicts. Such duress would constitute juror misconduct and, hence, prejudice to Daishjon Patton. The only way to obtain evidence to support this reasonable position and let the court know whether prejudice did occur to Daishjon Patton during the

course of his trial requires that counsel be given the addresses and telephone numbers of all the jurors in order to investigate same."

At the hearing on the motion, the trial court acknowledged, "[T]here were several jurors who were tearful at the time that the verdicts were returned in this matter." Mr. Higgins admitted he was speculating about the reason for the jurors' tears and questioning the jurors would be exploratory. The trial court denied the motion. The trial court reasoned: "I remember one juror appeared to be tearful coming out of the jury room. But when the verdicts were reached, that juror began to weep quietly. And there were a number of other jurors - - and I agree that it's not three, it could be four female jurors who were crying at the time that the verdicts were being returned. [¶] And I'm also mindful of the fact that both the defendants are very young men, and the victim in this case [was] a very young man. And I think that it would be a lot to expect that jurors would be robotic in the sense that those issues wouldn't impact them, particularly the age of the parties that are involved, both victims and defendants, as well as the serious nature. But I don't think that the mere fact that a juror would cry or show emotion necessarily rises to that level where there's good cause for the release of that information, so the motion is respectfully denied."

On appeal, defendants argue it is reasonable to assume that the four jurors who were openly weeping were unhappy with the verdicts. Defendants urge that we infer the verdicts were the product of duress, which could constitute juror misconduct. Mr. Robinson avers, "Experienced counsel asserted that such overt displays of emotion [were] often indicative of extreme psychological pressure to vote against their wills."

Pursuant to Code of Civil Procedure section 237, subdivision (b): "Any person may petition the court for access to [the court's record of personal juror identifying information]. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information . . . ." There is a strong public policy in favor of protecting

37

juror privacy. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1092; *People v. Duran* (1996) 50 Cal.App.4th 103, 118.) The Court of Appeal for the Third Appellate District has explained the meaning of "good cause" in the present context: "[D]efendant [must] set[] forth a sufficient showing to support a reasonable belief that jury misconduct occurred . . . ." (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 552; accord, *People v. Carrasco* (2008) 163 Cal.App.4th 978, 990; *People v. Wilson* (1996) 43 Cal.App.4th 839, 850.) As the Court of Appeal explained in *Rhodes,* "Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information as a matter of right in each case. This rule safeguards both juror privacy and the integrity of our jury process against unwarranted 'fishing expeditions' by parties hoping to uncover information to invalidate the jury's verdict." (*People v. Rhodes, supra,* 212 Cal.App.3d at p. 552.) Our review is for an abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317; *People v. Johnson* (2013) 222 Cal.App.4th 486, 492.)

The trial court did not abuse its discretion. Mr. Higgins merely speculated as to the reason several jurors were crying. This was insufficient reason to release juror identification information. In a related context, in *People v. Williams* (1997) 16 Cal.4th 153, 229, defense counsel sought to reopen voir dire because the jury's penalty phase deliberations lasted only 1 hour and 45 minutes. Defense counsel speculated the jury cut short its deliberations out of prejudice. Our Supreme Court held that speculation did not establish good cause to reopen voir dire. Our Supreme Court held, "'Voir dire is not to be reopened on speculation that good cause to impanel a new jury may thereby be discovered; rather, a showing of good cause is a prerequisite to reopening.' (*People v. Fauber* (1992) 2 Cal.4th 792, 846.)" (*People v. Williams, supra,* 16 Cal.4th at p. 229.)

In *People v. Wilson, supra,* 43 Cal.App.4th at pages 849-852, the defendant was convicted of first degree murder. Defense counsel premised a request for juror identification information on the following grounds: "'[I]t appears that the verdict as to first degree murder was reached based on the following premise: If Mr. Wilson was at

38

the scene, whether he was the shooter or not, he was a principal. If he brandished a gun he must have intended to use it; if he intended to use it he must have thought of it beforehand; and if someone died as a result of that incident the murder must be premeditated.'" (*Id*. at p. 850.) Division Three of the Court of Appeal for this appellate district rejected defendant's argument. Our Division Three colleagues held the trial court did not abuse its discretion in denying the motion for release of juror information where defense counsel did not show good cause. Our Division Three colleagues held, "[D]efense counsel's request did not show good cause and stated 'at best speculation on the part of how the jurors might have arrived at their verdict' . . . ." (*People v. Wilson, supra,* 43 Cal.App.4th at p. 852.)

The present trial involved a very young defendant and a young victim who was killed. This was as likely a reason for jurors to be weeping as any other. There was no showing of any statement made or conduct occurring suggestive that any juror was pressured or intimidated to reach a specific verdict. The jurors were polled and individually and unanimously affirmed their verdicts. There was no abuse of discretion.

Mr. Patton relies on three juror dismissal cases: *People v. Collins* (1976) 17 Cal.3d 687, 695-696, *People v. Diaz* (2002) 95 Cal.App.4th 695, 699, and *People v. Van Houten* (1980) 113 Cal.App.3d 280, 285-288. They are materially different from our case. In each of those cases there was evidence that emotional distress prevented a juror from performing the functions of a juror. There is no such evidence in the present case. Additionally, a trial court's authority to discharge a juror under section 1089 includes the authority to conduct an appropriate investigation to determine whether there is good cause to do so. (*People v. Alexander* (2010) 49 Cal.4th 846, 926; *People v. Keenan* (1988) 46 Cal.3d 478, 533.) The trial court's inquiry is limited in scope in order to avoid unnecessary intrusion upon the sanctity of the jury's deliberations. (*People v. Alexander, supra,* 49 Cal.4th at pp. 926-927; *People v. Cleveland* (2001) 25 Cal.4th 466, 485.) There is no danger, as here, of intruding upon a juror's privacy after a case has concluded. And, as the Attorney General correctly explains, "[N]one of these cases stand

for the proposition that, if a juror is crying, then it is likely that the juror was psychologically coerced into entering his [or her] verdict."

## G. Sentencing

### 1. Mr. Patton

#### a. cruel and unusual punishment

Mr. Patton was 16 years old when he committed the present crimes. Mr. Patton was sentenced to 25 years to life for first degree murder (§ 190, subd. (a)), plus a consecutive 25 years to life for firearm use (§ 12022.53, subd. (d)). He received concurrent sentences on the two attempted murder convictions. Mr. Patton argues his 50-year-to-life sentence is the functional equivalent of life without the possibility of parole and as such violates the Eighth Amendment's ban on cruel and unusual punishment. (*Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455, 2469]; *People v. Caballero* (2012) 55 Cal.4th 262, 268-269 [non-homicide offense].) The Attorney General argues that as a result of recent legislative activity, there is no Eighth Amendment violation. This issue is presently before our Supreme Court. (*In re Alatriste and Bonilla* (2012) 220 Cal.App.4th 1232, review granted February 19, 2014 (S214652 [*Alatriste*] and S214960 [*Bonilla*].) We hold that even if defendant's sentence is the functional equivalent of life without the possibility of parole, our Legislature has ameliorated the problem. Section 3051, enacted effective January 1, 2014, affords Mr. Patton a youth offender parole hearing at an earlier age than had he committed the present crimes as an adult. Section 3051 affords Mr. Patton a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. As a result, Mr. Patton's sentence is not unconstitutional as the functional equivalent of life without the possibility of parole.

40

### b.  section 186.22

With respect to counts 1 and 3, Mr. Patton was convicted of felonies committed for the benefit of a criminal street gang and was subject to punishment by imprisonment in the state prison for life.  As to each of counts 1 and 3, the trial court imposed a consecutive 10-year sentence under section 186.22, subdivision (b)(1)(C).  The trial court stayed the 10-year criminal street gang enhancements citing section 654, subdivision (a).  The trial court should have struck, rather than imposed and stayed, the 10-year criminal street gang enhancement as to counts 1 and 3.  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004-1005, 1011; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1404-1405.)  Mr. Patton was subject, instead, to a 15-year minimum parole eligibility term under section 186.22, subdivision (b)(5).  (*People v. Lopez, supra,* 34 Cal.4th at pp. 1004-1005, 1011; *People v. Arauz, supra,* 210 Cal.App.4th at pp. 1404-1405.)  The judgment must be modified and the abstract of judgment amended to strike the 10-year criminal street gang enhancement (§ 186.22, subd. (b)(1)(C)) as to counts 1 and 3.  As to Mr. Patton's sentence on count 2, no section 186.22  enhancement could be imposed.  This is because Mr. Patton was sentenced under section 12022.53, subdivisions (d) and (e)(1) and there was no finding he personally used or discharged a firearm in the commission of the offense. (§ 12022.53, subd. (e)(2).)  The judgment must be modified and the abstract of judgment amended to so provide.

### c.  section 12022.53

In sentencing Mr. Patton on count 1, the trial court purported to impose and stay (§ 654, subd. (a)) 10 and 20-year enhancements under section 12022.53, subdivisions (b) and (c) respectively.  For those enhancements to apply, the requisite facts had to be alleged in the information or indictment and either admitted or found true by the trier of fact.  (§ 12022.53, subd. (j); *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1124-1125; *People v. Najera* (1972) 8 Cal.3d 504, 509-510 & fn. 4.)  Here, although alleged in the

information, the section 12022.53 subdivisions (b) and (c) enhancements were neither admitted nor found true by the jury. As a result, it was error to impose and stay section 12022.53, subdivision (b) and (c) enhancements in sentencing Mr. Patton on count 1. The judgment must be modified to strike the enhancements to count 1 under section 12022.53, subdivisions (b) and (c). The abstract of judgment must be amended to omit those enhancements.

## 2. Mr. Robinson

The trial court properly imposed and stayed enhancements under section 12022.53, subdivisions (b) (counts 2 and 3) and (c) (count 2) as to Mr. Robinson, albeit under an incorrect section 654 analysis. (*People v. Gonzalez, supra,* 43 Cal.4th at p. 1130.) The enhancements were properly imposed and stayed under section 12022.53, subdivisions (f) and (j). (*People v. Gonzalez, supra,* 43 Cal.4th at pp. 1125-1130; *People v. Warner* (2008) 166 Cal.App.4th 653, 659.)

## 3. Mr. Patton and Mr. Robinson

### a. assessments

As to each defendant, the trial court imposed a single $40 court operations assessment (§ 1465.8, subd. (a)(1)) and a single $30 court facilities assessment. (Gov. Code, § 70373, subd. (a)(1).) The trial court should have imposed the assessments as to each count. (*People v. Sencion* (2012) 211 Cal.App.4th 480, 484-485 [court facilities and operations assessments]; *People v. Castillo* (2010) 182 Cal.App.4th 1410, 1415, fn. 3 [court facilities assessment]; *People v. Schoeb* (2005) 132 Cal.App.4th 861, 865-866 [court operations assessment]; see *People v. Alford* (2007) 42 Cal.4th 749, 758, fn. 6.) The oral pronouncement of the judgments must be modified to so provide. The abstracts of judgment are correct in this regard and need not be amended.

42

### b. presentence custody credits

The trial court gave defendants credit for 676 days in presentence custody. In addition, the trial court awarded Mr. Robinson 101 days of conduct credit. However, defendants were in custody from their arrest on March 7, 2011, until they were sentenced on January 11, 2013, a period of 677 days. The judgment must be modified and the abstract of judgment amended to reflect, as to each defendant, 677 days of presentence custody credit. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; *People v. Morgain* (2009) 177 Cal.App.4th 454, 469.) Mr. Robinson's conduct credit award is correct.

## IV. DISPOSITION

The judgment as to Mr. Patton is modified to strike the 10-year criminal street gang enhancements (Pen. Code, § 186.22, subd. (b)(1)(C)) as to counts 1, 2 and 3. The judgment as to Mr. Patton is further modified to strike the count 1 enhancements under Penal Code section 12022.53, subdivisions (b) and (c). The oral pronouncement of judgment as to both defendants is modified to impose a $40 court operations assessment (Pen. Code, § 1465.8, subd. (a)(1)) and a $30 court facilities assessment (Gov. Code, § 70373, subd. (a)(1)) *as to each count.* And the judgments as to both defendants are amended to award 677 days of presentence custody credit. The judgment is affirmed in all other respects. Upon remittitur issuance, the superior court clerk must prepare

43

amended abstracts of judgment and deliver copies to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P. J.


We concur:


MOSK, J.


KRIEGLER, J.

44